Filed 6/25/13  P. v. Oregon CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F062593 |
| Plaintiff and Respondent, | (Super. Ct. No. BF131156C) |
| v. | |
| JUAN CARLOS OREGON, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna, Barton Bowers and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

Appellant Juan Carlos Oregon and his codefendants, Jaime Vidal Aguirre and Anthony Manuel Perez, were jointly charged with offenses arising from a car chase and shooting involving two police officers. After the trial court severed appellant's trial from those of the codefendants, a jury convicted appellant of two counts of attempted premeditated murder of a peace officer (Pen. Code,[1] §§ 664, subds. (a) & (e), 187, 189; counts 1 & 2), two counts of assault upon a peace officer with a semiautomatic firearm (§ 245, subd. (d)(2); counts 3 & 4), and one count each of being a felon in possession of a firearm (§ 12021, subd. (a)(1); count 5), receiving a stolen vehicle (§ 496d, subd. (a); count 8), and recklessly evading a peace officer while operating a motor vehicle (Veh. Code, § 2800.2; count 9). The jury also found true the gang enhancement allegations in each count (§ 186.22, subd. (b)(1)), and the firearm enhancement allegations in counts 1 through 4 (§ 12022.53, subds. (c) & (e)(1)). The trial court imposed an aggregate prison term of 79 years to life.

Appellant contends, and respondent concedes, the trial court's admission of the codefendants' out-of-court statements detailing his role in the charged offenses violated his Sixth Amendment right to confront and cross-examine witnesses under the principles set forth in *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). They disagree, however, on whether the error was harmless under the applicable *Chapman*[2] standard. We conclude the trial court's federal constitutional error in admitting the codefendants' out-of-court testimonial statements was not harmless beyond a reasonable doubt and requires reversal of all of appellant's convictions except for his conviction for recklessly evading a peace officer in count 9.

---

[1] Further statutory references are to the Penal Code unless otherwise specified.
[2] *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

Because the issues may not arise on any retrial or, if they do, the context may be materially different, we do not reach appellant's claim that the trial court erred in admitting evidence he had shotgun shells in his possession at the time of his arrest, his numerous claims of instructional error, or his claim of cumulative error. However, appellant also claims that, absent the improperly admitted statements of his codefendants, the evidence was insufficient to support the offenses charged in counts 1 through 5. Because these claims could preclude retrial if meritorious we address them and conclude the admissible evidence was sufficient to support the offenses of attempted murder of a peace officer and assault upon a peace officer with a semiautomatic firearm charged in counts 1 through 4. But, as respondent concedes, the admissible evidence was insufficient to support the offense of being a felon in possession of a firearm charged in count 5. Finally, we consider and reject as unpersuasive appellant's claim that insufficient evidence supports the section 186.22 and section 12022.53 enhancement allegations because there was insufficient evidence the crimes were gang related.

## *FACTS*

Around 9:00 p.m. on February 20, 2010, a blue Honda Civic with paper dealer plates caught the attention of Bakersfield Police Officers Rudy Berumen and Paul Yoon. Officer Yoon attempted to initiate a traffic stop by activating the red-and-blue light bar on top of their marked patrol car. The Civic did not stop right away but travelled another block and a half before pulling over at the intersection of Beale and Monterey.

The two uniformed officers got out of the patrol car and started to approach the Civic. Officer Berumen observed the Civic was occupied by three Hispanic males, and the back seat passenger was moving around quite a bit. Officer Yoon noticed a lot of movement amongst all the occupants but particularly between the driver and back seat passenger.

3

After the officers took a few steps towards the Civic, the car suddenly accelerated and headed southbound on Beale. The officers ran back to the patrol car and a high-speed chase followed. At a controlled intersection, the Civic ran a red light and made a sharp left turn onto East Truxtun. The Civic then made a right turn to continue southbound on Beale.

The patrol car followed the Civic onto Beale. According to Officer Yoon's testimony, the patrol car was about two car-lengths behind the Civic when he heard a gunshot and saw the lower portion of the Civic's rear window shatter out. He then heard a second gunshot which blew out the entire rear window. Officer Yoon saw the back seat passenger aim and fire two more shots at the patrol car. To avoid getting hit, Officer Yoon started taking evasive driving maneuvers, including swerving left and right to cover the entire roadway. In his testimony, Officer Berumen described the deliberate manner in which the back seat passenger shot at the patrol car: "It was more of a controlled shoot. It wasn't just a rapid fire. He had both hands on the gun pointing at our direction, firing his gun."

The Civic made an abrupt left turn from Beale onto East California, failing to stop at the stop sign. Officer Berumen testified the Civic started "fishtailing because it was going so fast." From East California, the Civic turned right onto South Owens. It did not stay on South Owens but made a "quick left onto the south alley of East California." The alley was not fully paved, and there was a lot of debris, dirt and rocks being kicked up in the air. Officer Berumen described the Civic's driving-style in the alley as "[v]ery evasive." The car was speeding and moving from right to left.

Officer Yoon testified that after he entered the alley and positioned the patrol car directly behind the Civic, another shot was fired at the officers followed seconds later by a final shot. After the final shot was fired, the Civic continued travelling eastbound in the

4

alley. Officer Yoon also testified that the Civic "turn[ed] off the headlights, trying to basically lose us—in the darkness."

Although it is not entirely clear, the order in which Officer Yoon described events suggests the lights on the Civic might have been turned off after the last two shots were fired in the alley. However, Officer Berumen specifically recalled that, as soon as the Civic entered the alley, "the vehicle blacked out, turned off all its lights, so it was definitely harder to see the vehicle."

After making several quick turns, the Civic stopped abruptly in the middle of a narrow residential street. Based on his training and experience, Officer Yoon suspected the three individuals in the Civic had led the officers to that location to engage in a shootout. Instead, they got out of the Civic and ran away.

Officer Yoon chased the driver but eventually lost sight of him. Officer Berumen chased the passengers but was unable to catch them. Before chasing them, he fired his duty firearm several times at the fleeing back seat passenger, who continued running.

Jeffery Cecil, a crime scene technician with the Bakersfield Police Department, testified that a black diaper bag found near the Civic contained three masks, a loaded, nine-millimeter semiautomatic handgun, a nine-millimeter cartridge casing, binoculars, and glass fragments. He found three additional nine-millimeter cartridge casings inside the Civic. One was under the front passenger's seat and the other two were on the back passenger's seat. Later forensics testing established that three of the cartridge casings Cecil collected were fired from the semiautomatic handgun found in the black diaper bag.

In addition, Cecil found a portable police scanner on the front passenger seat of the Civic. The scanner was in working condition and "broadcasting what would be described as the Bakersfield Police Department's Channel 1" which was "for the east side of Bakersfield." In the Civic's center console, he found a key fob with 11 shaved keys on it. He also found various items of clothing in the car, including a number of cotton work

5

gloves, a black hat with the letter "T" on it, a black T-shirt, and a blue beanie cap. A sock found in the trunk of the car contained live .45-caliber bullets.

The Civic's owner reported the car stolen on February 12, 2010.

Dianna Matthias, a supervising criminalist of the Kern County Regional Criminalistics Laboratory, testified regarding the testing she conducted on the Civic. She determined that two holes, found in the back area of the car, were caused by gunshots fired by someone holding a gun near the back seat of the car. She was able to exclude the driver and front seat passenger as having fired those two rounds.

Appellant was apprehended around 11:50 p.m., on April 13, 2010, after a patrol officer observed him driving a stolen blue Honda Accord. When the officer attempted to initiate a traffic stop, appellant accelerated and led the officer on a short car chase, which ended with appellant colliding into a fence. Appellant got out of the car and began to run. A backup officer arrived and the officers were able to catch appellant and handcuff him. A search of appellant's pockets uncovered some 20-gauge shotgun shells. Shaved keys were also found inside the car.

Detective Richard Dossey interviewed appellant on April 19, 2010. Appellant admitted he was driving the blue Civic during the February 20, 2010 incident. He told Detective Dossey they were coming from the area of Columbus and Beale. When the detective tried to ascertain whether appellant had stopped at an AM/PM store on Beale and Monterey prior to the traffic stop, appellant said, "No, that's where they first tried to stop us."

Appellant told Detective Dossey he used the shaved keys found in the Civic's center console to steal cars (though not specifically to steal the Civic), and that he had recently come into possession of some shaved Ford Mustang keys. Detective Dossey confirmed the keys found in the Civic's center console included two to three Ford-style keys which had been sanded or shaved down.

6

A gang expert opined that appellant and the codefendants were members of the Varrio Bakers criminal street gang. After being presented with a hypothetical based on the February 20, 2010, incident, the expert opined "these crimes [were] committed in association with and for the benefit of the Varrio Bakers criminal street gang." (Additional facts concerning the gang allegations are set forth, *infra*, in part III of the Discussion.)

The parties stipulated that the codefendants committed the crimes of premeditated attempted murder of a police officer, and assault upon a peace officer with a semiautomatic firearm. Appellant was prosecuted for those crimes, not as a direct perpetrator, but under multiple theories of vicarious liability.[3]

## DISCUSSION

**I.** ***Admission of the codefendants' out-of-court testimonial statements violated appellant's confrontation rights and requires reversal of all but one of his convictions***

### A. *Background*

Over defense counsel's repeated hearsay objections, the trial court admitted, through the testimony of Detective Dossey, incriminating statements made by the codefendants during their separate police interviews after they were arrested within days of the February 20, 2010, incident.[4]

---

**3** The jury was instructed on these theories pursuant to CALCRIM Nos. 400 (aiding and abetting: general principles), 401 (aiding and abetting: intended crimes), 402 (natural and probable consequences doctrine (target and nontarget offenses charged), 403 (natural and probable consequences doctrine (only nontarget offense charged)), 416 (evidence of uncharged conspiracy), and 417 (liability for coconspirators' acts).

**4** As appellant points out, the trial court overruled defense counsel's first set of objections and admitted Aguirre's and Perez's statements based on the belief that defense counsel "opened the door" to the evidence. We are inclined to agree with appellant's argument that the prosecution did not gain the right to admit the codefendants' inadmissible statements detailing appellant's involvement in the offenses simply because defense counsel asked Detective Dossey, during cross-examination, whether there was any evidence appellant fired a gun or had a gun in his possession during the incident, which elicited the response, "Other than the other co-

7

During their interviews, the codefendants both identified appellant as the driver of the blue Civic. In addition, Aguirre said that "everybody in the vehicle was armed or heated with a firearm" during the incident.

The codefendants both described appellant as possessing a TEC-9 or TEC-style firearm. Detective Dossey explained that a TEC-9 firearm "looks like a small submachine gun" and "has a magazine that's kind of towards the front of the trigger guard and can be made … fully automatic."

Aguirre reported that when he was arrested, appellant was present and armed but managed to escape. Appellant was carrying the TEC-9 firearm at that time and was wearing it "wrapped around his neck on … a strap or some type of apparatus to hold it close to his body."

Finally, Aguirre reported that, during the February 20, 2010 incident, when the police turned on their overhead lights to initiate the traffic stop, appellant told him "the vehicle was stolen, and he was going … to run or flee from that situation." Appellant "also told them that as soon as they tried to pull them over … that he wanted them to start shooting."

### B.    *Applicable Crawford and Aranda-Bruton Principles*

The confrontation clause of the Sixth Amendment of the United States Constitution provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'" (*Crawford*, *supra*, 541 U.S. at p. 42.) The phrase "'witnesses against him'" is not limited to in-court witnesses but also

---

defendants, no." (See, e.g., *People v. Gambos* (1970) 5 Cal.App.3d 187, 192 ["By allowing objectionable evidence to go in without objection, the non-objecting party gains no right to the admission of related or additional otherwise inadmissible testimony. The so-called 'open the door' or 'open the gates' argument is 'a popular fallacy.'"].) Without directly agreeing or disagreeing with appellant's argument, respondent concedes error, observing: "Whatever the contours of the equitable doctrine commonly referred to as 'opening the door'—or whether such a doctrine is valid …—the specter of an ineffective assistance of counsel challenge is present."

applies to admission of hearsay statements.  (*Id.* at pp. 50-51.)  The confrontation clause has traditionally barred "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  (*Id.* at pp. 53-54.)

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  (*Davis v. Washington* (2006) 547 U.S. 813, 822, fn. omitted.)

With respect to the *Aranda-Bruton* issue, "[t]he principle is well established:  '[A] nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant *is generally unreliable and hence inadmissible* as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.'  [Citation.]"  (*People v. Hill* (1992) 3 Cal.4th 959, 994, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  The holding that admission of a nontestifying defendant's extrajudicial statements implicating a codefendant violates the codefendant's rights under the confrontation clause, "extends only to confessions that are not only 'powerfully incriminating' but also 'facially incriminating' of the nondeclarant defendant."  (*People v. Fletcher* (1996) 13 Cal.4th 451, 455, fn. 1.)

### C.    *Analysis*

In light of the above principles, respondent's concession of error is well taken. The codefendants' out-of-court testimonial statements powerfully incriminating appellant

were admitted in violation of his confrontation rights. The question is whether the error was harmless.

"Under the *Chapman* test, *Aranda-Bruton* error is harmless where the properly admitted evidence against defendant is overwhelming and the improperly admitted evidence is merely cumulative. [Citation.] To find the error harmless we must find beyond a reasonable doubt that it did not contribute to the verdict, that it was unimportant in relation to everything else the jury considered on the issue in question. [Citations.] We employ the same analysis for *Crawford* error since the *Chapman* test also applies." (*People v. Song* (2004) 124 Cal.App.4th 973, 984-985; accord *People v. Burney* (2009) 47 Cal.4th 203, 232.)

We agree with the parties that appellant's conviction on count 5 for being a felon in possession of a firearm must be reversed. As respondent candidly acknowledges, apart from the codefendants' improperly admitted statements, "evidence that appellant possessed a firearm on the night of the shooting was scant." Aguirre's statement that all three of the defendants test-fired the semiautomatic handgun later used in the shooting was the only evidence directly tying appellant to the possession of that firearm. And the codefendants' statements regarding appellant's possession of a TEC-9 or TEC-style firearm constituted the only evidence of appellant being personally armed. Therefore, we are unable to say beyond a reasonable doubt that the codefendants' statements did not contribute to the jury's verdict on count 5.

We reach the same conclusion with respect to appellant's convictions on counts 1 through 4 for attempted murder of a peace officer and assault upon a peace officer with a semiautomatic firearm. In arguing the erroneous admission of the codefendants' out-of-court statements was harmless as to these counts, respondent does not claim the properly admitted evidence against appellant was overwhelming. Instead, respondent simply asserts the case against appellant was *quite strong* and that all the prosecutor's theories of

10

vicarious liability were *supported by the evidence*. While respondent's subsequent recitation of the properly admitted evidence makes a persuasive argument there was sufficient evidence to support the charges, it fails to demonstrate the error was harmless under the applicable *Chapman* standard.

We cannot say beyond a reasonable doubt that the codefendants' statements did not contribute to the verdict or that the jury would consider them unimportant or merely cumulative. To the contrary, Aguirre and Perez provided the only firsthand accounts of what appellant said and did inside the Civic on the night in question, without any opportunity for cross-examination. The improperly admitted statements constituted powerful evidence in support of the prosecution's theories of vicarious liability, particularly the theory that appellant aided and abetted his codefendants' commission of the intended crimes by verbally directing them to start shooting at the police officers.[5] The prosecutor specifically cited to the codefendants' statements in arguing this theory to the jury, and while portraying appellant as the chief instigator of the offenses, who "sets in motion absolutely everything that happens that night." Moreover, the codefendants' statements indicating all three of them were armed and that appellant, along with the others, test-fired the semiautomatic handgun before the shooting was powerful circumstantial evidence going to issues such as appellant's knowledge of the perpetrators' unlawful purpose and the probability the offenses would occur.

The prosecutor also relied on the codefendants' statements in his rebuttal argument to undermine the defense that appellant, in the prosecutor's words, was

---

[5] The jury was instructed on this theory pursuant to CALCRIM No. 401, in part, as follows: "The defendant and the People have stipulated, or agreed, that Jaime Aguirre and Anthony Perez committed the crimes of Premeditated Attempted Murder on a Police Officer and Assault with a Semi-Automatic Firearm on a Police Officer.… [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

11

"somehow caught up in this … accidentally" and that his codefendants incriminated him in an attempt to "shift the blame." The prosecutor stressed the point that the codefendants' statements incriminating appellant were believable not only because they were consistent in detail—both Aguirre and Perez identified appellant as the driver and provided similar descriptions of his firearm—but also because the codefendants admitted they too were armed during the incident and did not try to claim appellant was the shooter. These factors, the prosecutor argued, were incompatible with the defense theory of blame shifting. The prominent role the codefendants' statements played in closing argument reflects their importance to the prosecution's case against appellant. On this record, we are unable to conclude beyond a reasonable doubt that the codefendants' out-of-court statements did not contribute to the jury's verdict on the charges of attempted murder of a peace officer and assault upon a peace officer with a semiautomatic firearm in counts 1 through 4.

We reach the same conclusion with respect to appellant's conviction on count 8 for receiving a stolen vehicle. On the question of whether appellant had knowledge the Civic was stolen, there was no evidence as strong as Aguirre's improperly admitted statements that, when the police initiated the traffic stop by turning on their overhead lights, appellant specifically told him that the car was stolen and that he planned to flee. The statements were not cumulative of other evidence. Appellant did not admit to stealing the Civic or knowing it was stolen during his police interview. Although we believe appellant's knowledge can reasonably be inferred from the circumstances demonstrated by the properly admitted evidence, we cannot say beyond a reasonable doubt that the error in admitting the codefendants' statements did not contribute to the verdict on count 8.

We can, however, say the error was harmless beyond a reasonable doubt with respect to appellant's conviction on count 9 for recklessly evading a peace officer while

12

operating a motor vehicle. The admissible evidence on this charge was overwhelming. In his police interview, appellant admitted he was the driver and indicated he knew the officers were trying to pull him. The codefendants' identification of appellant as the driver was cumulative of this evidence, and Aguirre's statement that appellant told him he planned to flee was relatively unimportant in relation to the evidence of appellant's actual conduct in leading the officers on a dangerous, high-speed chase at night through the streets of Bakersfield. For these reasons, we conclude the erroneous admission of the codefendants' statements did not prejudice appellant on count 9.

**II.** ***Sufficient evidence supports the charges of attempted murder of a peace officer and assault upon a peace officer with a semiautomatic firearm in counts 1 through 4, but insufficient evidence supports the charge of being a felon in possession of a firearm in count 5***

Appellant contends that, absent the codefendants' inadmissible statements incriminating him, the admissible evidence was insufficient to support the charges of attempted murder of a peace officer and assault upon a peace officer with a semiautomatic firearm under any of the prosecution's theories of vicarious liability.

We review a claim of insufficient evidence by determining whether, viewing the whole record in the light most favorable to the prosecution, the record discloses substantial evidence—evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Osband* (1996) 13 Cal.4th 622, 690.) "'We "'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"' [Citation.]" (*Ibid.*)

"In making our determination, we do not reweigh the evidence .… We simply consider whether ""*any* rational trier of fact could have found the essential elements of [each conviction challenged] beyond a reasonable doubt.'" [Citations.]' [Citation.] Unless it is clearly shown that 'on no hypothesis whatever is there sufficient substantial

13

evidence to support the [jury's] verdict[s,]' we will not reverse." (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.)

In challenging the sufficiency of the evidence supporting counts 1 through 4, appellant first asserts there was insufficient evidence to support the theory he intentionally aided and abetted the intended crimes of his codefendants. In essence, appellant argues his conduct in driving the Civic to escape the police officers was factually incompatible with a finding he was simultaneously trying to help the back seat passenger shoot at the officers. Thus, appellant asserts: "By increasing the distance between the Civic and the patrol car, [he] would actually be doing an act that ended, rather than encouraged, the shooting offenses." He further asserts that "his act of continuing to accelerate his vehicle while his backseat passenger was shooting at the officers demonstrates a lack of an intent to kill."

Contrary to appellant's assertions, a rational juror could infer from all the circumstances demonstrated by the admissible evidence that appellant was attempting to avoid capture by the police officers *while at the same time* intentionally facilitating his codefendants' commission of the shooting offenses. For example, there was evidence from which one could reasonably infer that appellant led the police officers from one of the main streets into an alley and shut off all the lights on the Civic to improve the shooter's ability to see and target the patrol car, while at the same time facilitating his and the codefendants' escape by obscuring the officers' view of the Civic. As respondent points out, there was also evidence supporting the other theories of vicarious liability presented to the jury in this case. However, because we see sufficient evidentiary support for at least one theory, we need not address all the potential theories the prosecutor might pursue on retrial but quickly dispense with appellant's sufficiency of the evidence challenge to the charges in counts 1 through 4.

14

We reach a different conclusion with respect to count 5.  For reasons discussed above in connection with appellant's Sixth Amendment claim, we agree with the parties that the properly admitted evidence was insufficient to support the charge of being a felon in possession of a firearm.  Apart from the codefendants' improperly admitted statements, there was little evidentiary support for the possession element of the offense.

## III.    *Sufficient evidence supports the gang and firearm enhancements*

Finally, we reject appellant's claim that there was insufficient evidence to support the gang enhancements (§ 186.22, subd. (b))[6] and gang-related firearm enhancements (§ 12022.53, subd. (e)).[7]  Specifically, he claims there was insufficient evidence to establish the second prong of the gang enhancement:  the "specific intent to promote, further, or assist in any criminal conduct by gang members ...."  (§ 186.22, subd. (b)(1).)

### A.    *Background*

Officer Brent Stratton testified as a gang expert and described the Varrio Bakers criminal street gang, which he identified as a subset of the Sureño gang in Bakersfield. The gang's primary activities include murder, shootings, possession of firearms, narcotics sales, robberies and carjackings.

Officer Stratton opined that appellant and the codefendants were all active members of the Varrio Bakers gang and explained the bases for his opinion.  In explaining his opinion concerning appellant, Officer Stratton testified he reviewed

---

**6**    Section 186.22, subdivision (b)(1), states:  "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows .…"

**7**    Section 12022.53 provides:  "(e)(1) The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved:  [¶]  (A) *The person violated subdivision (b) of Section 186.22.*  [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d) [including attempted murder, as specified in subdivision (a)(1) & (18)]."  (Italics added.)

15

appellant's jail booking records and his prior contacts with the Bakersfield Police Department and Kern County Sheriff's Department.

Appellant had a total of seven prior bookings. In his three oldest bookings, he claimed no gang affiliations. But when he was booked on October 23, 2008, he stated that he belonged to "South," which is synonymous with Sureño, and needed to be kept away from "North." He claimed the same affiliation to South during subsequent bookings on January 14, 2009, on April 5, 2009, and, finally, on April 17, 2010.

Officer Stratton further testified that the following contacts with law enforcement were significant in forming his opinion that appellant was an active member of the Varrio Bakers gang:

On August 5, 2004, appellant was contacted within Varrio Bakers territory.

On October 14, 2006, appellant was a passenger in a vehicle contacted during a narcotics investigation in Varrio Bakers territory.

On April 27, 2007, when officers were conducting an investigation into possession of a firearm, they contacted appellant at the residence where the firearm was located and where the suspect, a Varrio Bakers gang member, was arrested.

On July 20, 2008, appellant was arrested for a vehicle burglary and found in the company of Varrio Bakers gang member. Burglary is one of the gang's primary activities, and the burglary occurred in the gang's territory.

On March 30, 2009, when officers were dispatched to a suspected gang fight in Varrio Bakers territory, appellant was contacted in a vehicle that matched the description of the vehicle involved in the fight.

On April 5, 2009, appellant was arrested for charges related to auto theft. At the time of his arrest, appellant was wearing a hat with the letters KC on the front. Officer Stratton explained Kern County gang members often wear this style of hat to signify their gang affiliation and during the commission of crimes to benefit the gang.

16

On January 24, 2010, appellant and two other Varrio Bakers members—Jaime Aguirre, appellant's codefendant in the instant case, and Joey Gonzalez—committed a home invasion robbery where they held the victims at gunpoint. After the robbery, the victims chased the suspects into the parking lot. The suspects, including appellant, turned around and fired between 10 and 13 shots at the victims. Officer Stratton opined those crimes were committed by appellant for the benefit of, in furtherance of, and in association with the Varrio Bakers gang because robbery is one of the primary activities of the gang, the crimes occurred in the gang's territory, and were committed in the company of two other members of the gang .

On February 4, 2010, appellant was arrested for grand theft auto, which is one of the primary activities of Varrio Bakers gang.

On February 20, 2010, appellant committed the instant crimes in the company of the codefendants, who were both members of the Varrio Bakers gang. Officer Stratton acknowledged he testified in the codefendants' trials and confirmed they were both convicted.

Officer Stratton provided the following explanation for his opinion that the crimes in this case were gang-related:

> "And I would base it on several key factors in your hypothetical. One of which would be the fact that they were occupying a stolen vehicle, which is one of the primary activities of the Varrio Bakers.
>
> "Two would be the presence of firearms which, again, in my opinion, are one of the primary activities of the Varrio Bakers.
>
> "You also talked about several different things that of themselves may be benign, but when you consider the totality of the circumstances, the things you're referring to as scanner, and ski masks, the presence of firearms, would lead me to believe that they were possibly involved in another one of their primary activities of the Varrio Bakers criminal street gang. The fact that the others inside the vehicle were Varrio Bakers, that they're wearing colors associated with the Varrio Bakers, the fact that they

17

commit these crimes in Varrio Baker territory and ultimately attempt to flee in Varrio Baker territory is an area which would be most friendly and conducive to facilitating their escape also help to factor in my opinion."

Officer Stratton explained that the hat with a "T" on it found inside the Civic was significant because it could be used to signify the Traviesos, which is a subset of the Varrio Bakers criminal street gang.

As to the gang-benefit of the crimes, Officer Stratton testified:

"Well, they gain respect and notoriety amongst other gang members within their gang.

"It enhances their status within the gang.

"In my opinion, it enhances their lawless reputation of the gang with the outside community as a whole.

"And money is generated from these type of illicit activities are used to benefit the gang members and the gang as a whole."

## B.    Analysis

Appellant asserts "there was an absence of substantial evidence to establish that appellant intended to and did commit the charged offenses with known members of the gang." He continues: "Although the evidence established that Aguirre and Perez were members of the Varrio Bakers, it failed to establish appellant's membership in the gang." Appellant further argues that the evidence "failed to establish that he intended to aid and abet the co-defendants in the commission of the offenses in Count 1 through 4," but merely demonstrated "he had a personal motive in committing the reckless evading offense, in that he was driving a stolen vehicle, and wanted to avoid an encounter with the police." We find appellant's assertions unpersuasive.

In challenging Officer Stratton's opinion that he was a member of the Varrio Bakers gang, appellant focuses on the lack of evidence he specifically identified himself as a member of the gang in his jail bookings. However, Officer Stratton's testimony regarding appellant's numerous contacts with law enforcement was more than sufficient

18

to support a finding appellant was an active member of the Varrio Bakers gang. In arguing to the contrary, appellant overlooks information, relied on by Officer Stratton in rendering his opinion, that appellant committed crimes with other members of the Varrio Bakers on more than one occasion, including a robbery and shooting with Aguirre just under a month before the current incident. In short, there was ample evidence to support a reasonable inference that, when appellant claimed affiliation with "South" during his jail bookings, the Varrio Bakers was the particular southern gang he had in mind.

Under existing case law, the fact that appellant, a member of the Varrio Bakers gang, committed the crimes in the company of two other members of the same gang, supports an inference that his crimes were gang related. (See *People v. Miranda* (2011) 192 Cal.App.4th 398, 412-413 [commission of crime accompanied by gang members or associates supports inference defendant intended to benefit gang]; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 322 [nongang member's commission of crime in association with known gang member supports inference crime was gang related]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198-1199 [commission of crime with fellow gang members supports inference crime was committed in association with gang].)

For reasons already discussed, we reject appellant's assertion that there was insufficient evidence he intended to aid and abet his codefendants in their commission of the shooting offenses. That the evidence might also support an inference that appellant had a personal motive in fleeing the police does not preclude, and the evidence supports, a finding he acted with the requisite intent to assist any criminal conduct of gang members.

## *DISPOSITION*

The judgment of conviction is reversed on counts 1, 2, 3, 4, 5, 8, and affirmed on count 9.

_____

HILL, P. J.

WE CONCUR:

_____

WISEMAN, J.

_____

POOCHIGIAN, J.

20