Filed 6/22/15  P. v. Baker CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ADAM RANDY BAKER,<br><br>    Defendant and Appellant. | G048818<br><br>(Super. Ct. No. 11ZF0104)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseño, Judge.  Affirmed in part, reversed in part and remanded for resentencing.

Law Offices of William J. Kopeny and William J. Kopeny for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

This case illustrates the wisdom of the advice mothers and football coaches often give: Nothing good happens after midnight.

The indictment in this matter charged defendant Adam Randy Baker with the murder of Robert Sickles (Pen. Code, § 187, subd. (a); count one; all undesignated statutory references are to the Penal Code), the attempted murder of Brian McTeigue (§§ 187, subd. (a), 664, subd. (a); count two), and assault with a deadly weapon (§ 245, subd. (a); count three). It further alleged defendant personally used a knife (§ 12022, subd. (b)(1)) in the commission of the offenses charged in counts one and two, and personally inflicted great bodily injury (§ 12022.7, subd. (a)) on McTeigue. Prior to the taking of evidence, the court granted the prosecution's motion to dismiss the assault charge.

The jury found defendant guilty of murder, attempted murder, and found the weapon enhancements true. The court sentenced to a total of 16 years to life on the murder, consisting of 15 years to life plus one year on the section 12022, subdivision (b)(1) enhancement attached to the murder charge. The court then sentenced defendant to one-third the middle term (two years and four months) on the attempted murder, one-third the term provided for the knife enhancement attached to the attempted murder charge (four months), and ordered the sentence on the attempted murder and the attached enhancement to run consecutively to the term imposed on the murder count.

Defendant appeals, claiming prosecutorial misconduct, ineffective assistance of counsel, and the failure to instruct on a lesser included offense require reversal. We find defendant's arguments unpersuasive. However, we sought and obtained supplemental briefing from the parties on whether the trial court imposed an unlawful sentence (see *People v. Neely* (2009) 176 Cal.App.4th 787, 798-799 [manner sentences are to be calculated when court sentences on indeterminate and determinate terms]) on the attempted murder and its concomitant enhancement. We have considered the supplemental briefs and conclude the sentence imposed by the court is unauthorized.

2

We therefore remand the matter for resentencing on the attempted murder conviction and the enhancement attached to that conviction.

I

FACTS

On New Year's Eve 2010, Robert Sickles and David Hanlin, his younger half brother, went to a party at the Hilton Hotel in Costa Mesa with some friends, including Brian McTeigue and Kevin Stacey. It was Stacey's birthday. There was a very large party at the hotel. The line to get into the party went around a parking structure and up to the second floor. The group stayed together and did not have a problem with anyone inside the party. At closing time, about 1:50 or 2:00 a.m., people started leaving the party. Sickles and Hanlin left first, with McTeigue and Stacey about 20 feet behind them.

Hanlin and Sickles walked toward the valet area to get their group together to wait for a taxi. They were laughing and having a good time. Then someone tossed a cigarette that landed between Hanlin's legs. When Hanlin looked to his right to see where it came from, he heard, "What the F are you looking at?" He did not realize he was the person to whom the statement was made because he had not had contact with anyone outside his group. He continued to look around and defendant charged toward Hanlin, repeating the question. Sickles stepped in front of Hanlin and told defendant to calm down and to sit down. Defendant hit Sickles in the face without warning. Sickles asked, "What the F," and punched defendant back.

McTeigue and Stacey heard a commotion as they exited the hotel and went to see what it was. Defendant and Sickles were "basically" shoving and wrestling. It reminded McTeigue of two boxers in a clench. Stacey saw defendant pull out something and start swinging at Sickles with his right arm, striking Sickles in the chest. Hanlin heard Stickles say, "He F'ing stabbed me." McTeigue ran to Sickles, shoved defendant

3

away from Sickles, and attempted to get Sickles out of the area. Defendant swung and hit McTeigue in the back. Hanlin went to defendant and punched him once, knocking defendant down. Hanlin was already backing away from defendant when defendant rolled over onto his hands and knees. Defendant had a knife in his hand. As Hanlin backed away, McTeigue ran past him and kicked defendant, causing defendant to go onto his back.

Hanlin then went to Sickles, who "was just bleeding everywhere." The group ran with Sickles about 50 yards before he collapsed. Hanlin tried to stop the bleeding, but he could not apply enough pressure and blood sprayed through his fingers.

When the paramedics arrived, they asked for McTeigue's shirt to stop Sickles's bleeding. At that point, McTiegue realized he had been stabbed in the back and was bleeding too.

A pathologist who supervised Sickles's autopsy testified the knife entered Sickles's left chest about midchest and once lower on the left side of his chest. The lower wound was not fatal and penetrated only about three-quarters of an inch. The higher stab wound was lethal. The knife pierced Sickles's left lung, the pericardial sac, and the pulmonary artery. Approximately a half gallon of blood was recovered from his left chest cavity.

Police recovered a knife from the scene. Blood found at the scene was tested for DNA. Neither Sickles nor defendant could be excluded as the two contributors to the blood.

Police obtained a surveillance video of the incident from the hotel. They also obtained a cell phone video from a civilian witness. The cell phone video showed defendant on the ground with something in his hand, defendant starting to get up from the ground, McTeigue kicking him in the shoulder, and Sickles kicking defendant on the ground. Once defendant stopped moving, no one accosted him.

4

*Defense Evidence*

Defendant testified in his own defense. He said he went to the party at the hotel because his cousin had an extra ticket, so he could get in for free. Defendant claimed not to remember whether he had a knife on him or whether he used a knife that night. According to defendant, he had two beers before the party, and a beer and a shot at the party. The last thing defendant remembered about that night was walking out of the hotel. He had "no idea" if he stabbed Sickles and McTeigue.

Defendant said he received a stab wound to his leg, multiple facial fractures, and a broken jaw, palate, and nose. He spent six or seven days in the hospital.

When asked whether he usually carries a knife, defendant said he carries a knife when he goes fishing. Around the time of the party, he had been fishing four to five days a week. Although he did not go fishing on New Year's Eve day, he had intended on fishing earlier that day.

On cross-examination, defendant said he "couldn't say for sure" whether the Boker Magnum knife recovered at the scene was his. He admitted he owned one "just like" the one recovered, the knife recovered could be his, and the knife can be easily opened with one hand. When defendant got out of jail, he went through his belongings that had been removed from the apartment he was living in at the time of the incident. He did not find his knife.

Defendant's friend Scott Hudson was with him at the party, along with three other friends. Hudson left the hotel that night with defendant. They sat in two chairs outside the hotel and attempted to get a taxi. Defendant and Hudson were both smoking cigarettes outside the hotel. Defendant flicked his cigarette to the ground. They were both looking at their cell phones at that time and Hudson heard someone say, "Hey, hey," and swear at defendant. In his grand jury testimony, and in speaking to a detective about the incident, Hudson said the person asked defendant, "Dude, what was that

5

about?" Hudson did not mention anyone swearing at defendant. He also admitted his memory was better when he testified at the grand jury hearing.

At trial, Hudson said he looked up and saw someone approaching defendant. Defendant stood up, words were exchanged and there was "a bit of a shoving match." Four or five of the other individual's friends rushed defendant and started throwing punches at defendant. He said the men continued punching defendant as defendant backed away. He did not see defendant with a knife. Hudson said he did not get involved in the fight.

In his grand jury testimony, Hudson never mentioned individuals rushing defendant. In fact, he testified defendant stood up and approached Sickles, but he could not remember who started the shoving and who threw the first punch.

In his trial testimony, Hudson said he attempted to go to defendant once defendant was on the ground, but he was not able to do so. He went to where another friend was standing and they attempted to discover the hospital where defendant was transported. When they could not, their group went home.

Nancy Diezmo testified she saw "violence occurring" to a man on the ground as she drove away from the hotel. She said she saw between five-to-10 punches and perhaps 10 kicks delivered to the man on the ground, but she did not see what had happened before that.

A number of witnesses testified defendant had a reputation for being honest and nonviolent. The prosecutor cross-examined defense witnesses about defendant's tattoos.

Costa Mesa Police Department Detective Kevin Condon said he interviewed defendant at the hospital. Defendant gave Condon the brand name of his knife and asked if it had been used in the incident. Condon said it had, and defendant

6

responded, "Jesus . . . Christ." Defendant denied remembering anything about the incident.

## II

## DISCUSSION

### A. *Prosecutorial Misconduct*

Although attorneys on both sides are given leeway in discussing the applicable law, "it is improper for a prosecutor to misstate the law" (*People v. Bell* (1989) 49 Cal.3d 502, 538), particularly when the misstatement lightens the prosecution's burden of proof. (*People v. Williams* (2009) 170 Cal.App.4th 587, 635.) "Misconduct that infringes upon a defendant's constitutional rights mandates reversal of the conviction unless the reviewing court determines beyond a reasonable doubt that it did not affect the jury's verdict. (*Chapman v. California* (1967) 386 U.S. 18; *People v. Hall* (2000) 82 Cal.App.4th 813, 817, citing *People v. Harris* (1989) 47 Cal.3d 1047, 1083.) A violation of state law only is cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the untoward comment. (*People v. Watson* (1956) 46 Cal.2d 818; *People v. Milner* (1988) 45 Cal.3d 227, 245.) In either case, only misconduct that prejudices a defendant requires reversal (*People v. Fields* (1983) 35 Cal.3d 329, 363), and a timely admonition from the court generally cures any harm. (See *People v. Gallego* (1990) 52 Cal.3d 115, 200.)" (*People v. Pigage* (2003) 112 Cal.App.4th 1359, 1375.)

"'"'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the

7

prosecutor's comments before the jury, . . . '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.] To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]" [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm.' (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)" (*People v. Adams* (2014) 60 Cal.4th 541, 568-569.) We review de novo whether misconduct resulted in a constitutional violation. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.)

Defendant contends the prosecutor engaged in a number of instances of misconduct. We address each instance in turn.

1. *Evidence of Defendant's Tattoos*

Defendant contends the prosecutor denied the defendant due process by misusing evidence of defendant's tattoos as bad character evidence and to impeach defense character witnesses who testified defendant had a reputation for nonviolence. He notes ordinary evidentiary rulings are usually reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836, but reversal is required under *Chapman v. California* (1967) 386 U.S. 18, 24, when the rulings denied a defendant a fair trial.

As noted above, a number of witnesses testified defendant had a reputation for being honest and nonviolent. The prosecutor questioned four defense witnesses about defendant's tattoos. For example, Nathan Arthur, one of defendant's character witnesses, was questioned about defendant's skull and crossbones tattoo, as well as a tattoo of a knife with a drop of blood on the tip, that defendant had on one of his calves. The prosecutor asked Arthur whether "anybody else of your peaceful friends have a tattoo of

8

a knife with what appears to be blood dripping off the end of it?" And, whether "any of your other peaceful friends have skull and crossbones tattooed on them?"

Hudson, a defense witness who testified about what he saw of the incident, stated defendant is "not a killer." The prosecutor then questioned Hudson about his own tattoos and defendant's tattoos, asking Hudson if he ever discussed with defendant the fact that each of them has a tattoo of a skull and crossbones.

There apparently were no objections to these questions, so the issue has been forfeited. (Evid. Code, § 353; *People v. Dykes* (2009) 46 Cal.4th 731, 756.) However, while evidence of defendant's tattoos was irrelevant for purposes of impeaching his character for honesty and nonviolence, that does not mean the prosecutor committed misconduct by asking the unobjected to questions, or that the questioning prejudiced defendant. We note that unlike a typical gang case where an expert testifies to the meaning of a defendant's *gang* tattoos (see *People v. Lindberg* (2008) 45 Cal.4th 1, 46-47 [number of state and federal cases have upheld gang expert's testimony as to meaning of gang "tattoos, symbols, and graffiti"]), there was no testimony as to the meaning of defendant's tattoos. Tattoos have different meanings to different people. We are not prepared to say that tattoos of a skull and crossbones, a knife with a drop of blood on the tip, or an empty bottle of alcohol (in addition to a number of rose tattoos and a tattoo of his mother's name) are more likely to be found on one who is violent, dishonest, or "a heavy partier" than one who has no such tattoos. Tattoos of skull and crossbones are very common and popular. (For an example of hundreds of different skull and crossbones tattoos, including female skulls with ribbons, see <http://www.bing.com/images/search?q=skull+and+crossbones+tattoos&id> [as of June 12, 2015].) Still, not every question by a prosecutor calling for irrelevant evidence amounts to misconduct. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 755 [prosecutor

9

asked four irrelevant questions and court found "defendant has not demonstrated prosecutorial misconduct in asking . . . irrelevant questions"].)

Even were we to assume the prosecutor's questions amounted to misconduct, defendant has failed to demonstrate prejudice. (*People v. Stewart* (2004) 33 Cal.4th 425, 462.) When asked what the tattoo of the bottle meant, defendant explained the design was from an album of a band he liked. Another witness was asked about whether defendant's tattoo of an empty bottle "looks like a tattoo of somebody who parties a lot?" The witness responded that it "looks like a tattoo of an alcohol bottle." At one point, when the prosecutor asked whether a particular tattoo indicates a person "is a heavy partier," the same witness responded, "Is that a serious question? That does not make a person a partier." The answers of defendant's character witnesses defused the direction of the prosecutor's questions, even if the questions were asked for an improper purpose. Moreover, defendant admitted he likes "to go out and drink." As we stated above, a large number of people have tattoos, and for a wide variety of reasons.

What is more, it does not appear that disclosing defendant's tattoos was prejudicial. It was not as if he had a swastika or some other symbol of hate on his body. As defendant himself testified, most of his tattoos are of roses.

### a. *Ineffective Assistance of Counsel*

Recognizing defense counsel did not object to the prosecutor's questions regarding defendant's tattoos, defendant claims that if we find the misconduct issue forfeited due to a failure to object, then counsel was ineffective. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate not only that defense counsel's performance fell below an objective standard of reasonableness under prevailing profession norms, but must also demonstrate counsel's shortcoming caused him prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) This requires the defendant to demonstrate a reasonable probability the outcome of the case would have

been different but for counsel's shortcomings. (*Id*. at p. 664.) Additionally, "'"[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) Moreover, if counsel's failure to object can be attributed to a sound tactical strategy, the court will presume the failure to object was the result of the sound tactical decision. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)

Defendant's ineffective assistance of counsel challenge must fail given we have concluded that even were we to assume questions concerning defendant's tattoos were misconduct, any such error would have been harmless. When it is evident an ineffective assistance of counsel claim fails due to a lack of prejudice, the court need not address the issue of counsel's competence and should resolve the issue on the lack of prejudice alone. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)

2. *Argument by the Prosecutor*

While conceding the jury was properly instructed that a claim of self-defense cannot be contrived (see CALJIC No. 5.55), defendant claims the prosecutor committed misconduct by arguing defendant was not entitled to self-defense because defendant "started it" by flicking his cigarette. Defendant's citation to the record does not support the conclusion defendant *initiated* a fight by flicking a cigarette. Defendant's tossing his cigarette eventually led to a fight, but it was not the beginning of a fight. According to prosecution witnesses, the actions of defendant thereafter started the fight. He approached Hanlin, but when Sickles stepped in front of Hanlin, defendant struck Sickles. A defense witness said one person from Sickles's group approached defendant

11

after defendant flicked his cigarette, the two started fighting, and then the rest of Sickles's group approached defendant and entered the fray. Still, Hudson did not say who started the fight.

In responding to defense counsel's argument that defendant acted in self-defense, the prosecutor told the jury defendant was not entitled to self-defense. Specifically, the prosecutor argued one cannot pick a fight with five people and pull out a knife because he feels he might get beaten up. He also argued self-defense cannot be contrived, and that it was in this case: "[Defendant] picks a fight with [Hanlin], and he winds up fighting with [Sickles], and now he's coming in saying it was multiple guys, so I get to kill some of them. Imagine if that was the law."

In his opening argument, the prosecutor told the jury: "Don't pick fights. And if you do, you got to stop fighting before you can claim self-defense. And I submit to you, with this instruction alone, . . . the defense fails. After he has done all three things, he has a right to self-defense if his opponent continues to fight, or if the victim of a simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense." It is evident the prosecutor was referring to CALJIC No. 5.54. That instruction states a defendant who was the initial aggressor may claim self-defense in one of two situations. In the first situation, the defendant must (1) try in good faith to refuse to continue to fight, (2) make his opponent aware, as a reasonable person, that he (defendant) wants to stop fighting, and (3) by either words or conduct caused the opponent to be aware as a reasonable person that he (defendant) has stopped fighting. In the alternative, an initial aggressor is entitled to self-defense without the requirement of the necessity of attempting to withdraw if "[t]he victim of a simple assault respond[ed] in a sudden and deadly counterassault . . . ." (CALJIC No. 5.54.)

12

Defendant forfeited this issue by failing to object to the prosecutor's argument and by not requesting the court to admonish the jury. (*People v. Adams*, *supra*, 60 Cal.4th at pp. 568-569.) Even were the issue not forfeited, it must nonetheless fail. Although one who initiates a fight without deadly force and is confronted by a lopsided response when additional individuals join in on the other side of the fray may be entitled to self-defense notwithstanding the fact he was the initial aggressor (see *People v. Quach* (2004) 116 Cal.App.4th 294, 301-302 [an aggressor is entitled to self-defense without withdrawing and communicating his withdrawal if "the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, [and] he cannot retreat with safety"]), the prosecutor was not incorrect when he said an initial aggressor who "is all of a sudden faced with a deadly weapon," is entitled to use deadly force. The prosecutor's statement could have been more inclusive by recognizing an unexpected sudden counterassault by a number of men could constitute a "sudden and perilous" counterassault that would entitle the initial aggressor to self-defense, but the above argument did not misstate the law. Moreover, even if we found the prosecutor misstated the law, any error would have been harmless, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8.)

### a. *Ineffective Assistance of Counsel*

After briefs were filed in this matter, this court issued its opinion in *People v. Ramirez* (2015) 233 Cal.App.4th 940. Defendant thereafter requested to file a supplemental brief. We accepted the brief in which defendant claimed for the first time that counsel was ineffective for failing to object to the prosecutor's argument. Because the issue was not raised in the opening brief, it has been forfeited. (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.) Defendant argued in his opening brief the prosecutor

13

misstated the law. At the same time, defendant knew there had been no objection to the argument. Given those facts, the fact that our decision in *Ramirez* issued after the filing of defendant's reply brief does not excuse defendant from raising the issue of ineffective assistance of counsel in his opening brief.

Even if the claim had not been forfeited, our decision in *Ramirez* would not benefit defendant. In *Ramirez*, the defendants sought to *provoke* a fistfight with rival gang members. The incident resulted in the shooting of one of the rival gang members, purportedly when one of the rival gang members produced a gun. (*People v. Ramirez*, *supra*, 233 Cal.App.4th at pp. 944-945.) The trial court instructed the jury that "'[a] person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force.' [Citation.]" (*Id.* at p. 943.) We recognized the instruction is accurate in certain cases, but not all. (*Id.* at p. 947.) "A person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby 'forfeit[] . . . his right to live.' [Citation.] Instead, he may defend himself 'even when the defendant set in motion the chain of events that led the victim to attack the defendant.' [Citation.]" (*Id.* at p. 943.) In other words, the fact that an initial aggressor intends to provoke a fistfight does not mean the other person is entitled to use deadly force or a deadly weapon in response to the provocation.

The present case does not suffer from the error we found in *Ramirez*. Here, the jury was properly instructed pursuant to CALJIC 5.54. As we noted above, even if the prosecutor misstated the law at some point in his argument, we presume the jury followed the court's proper instruction. (*People v. Clair*, *supra*, 2 Cal.4th at p. 663, fn. 8.)

3. *Other Instances of Alleged Misconduct*

Defendant next argues the misconduct on the part of the prosecutor was pervasive and violated defendant's right to due process. In addition to the prosecutor

14

questioning character witnesses about defendant's tattoos, defendant claims the prosecutor argued with character witnesses that defendant's having being charged in the present case should have changed their opinions about defendant's character, employed a theme characterizing defendant as a "jerk,"[1] attempted to invoke sympathy for the victim, Sickles, and asked argumentative questions.

The failure to object to the alleged misconduct forfeited that issue. (*People v. Shazier* (2014) 60 Cal.4th 109, 129.) But even if we overlook the failure to object, defendant's opening brief failed to cite any authority for the propositions that any of the following constituted misconduct: (1) the prosecutor's questioning defense character witnesses about whether defendant's arrest for stabbing Sickles had an effect on his reputation; (2) the "jerk" line of argument; (3) the alleged reference to sympathy for Sickles; and (4) asking argumentative questions. Thus, the issue was forfeited a second time. (*People v. Collins* (2010) 49 Cal.4th 175, 199 [defendant who fails to object to misconduct on ground asserted on appeal forfeits issue]; Cal. Rules of Court, rule 8.204(a)(1)(B).)

a. *Ineffective Assistance of Counsel*

Recognizing there were no objections in most of these instances, defendant also again claims counsel was ineffective. Just as we did not address defendant's

---

[1] During his argument, the prosecutor asserted this was a bar fight and there is always a jerk in every bar fight. He asked the jury what, if anything, Sickles did wrong. He went on to argue: "And [defendant] flicks a cigarette and starts this entire process . . . . He makes a series of decisions, and what does [Sickles] see? He sees some jackass going after his brother who has done absolutely nothing. . . . And he punches defendant, as the defendant deserved, and they lock up and they are moving away from the doors, . . . and you heard evidence that [Sickles], after he was shoved in the face said something like, 'what the f' . . . so he walks out and all of a sudden he's in a confrontation with a guy he doesn't know, who he had no problems with, who shoves him in the face and next thing he knows he's got a knife plunging into his body." The prosecutor went on to argue, "[I]f [Sickles is] not the jerk, . . . then the jerk is sitting right there and the law says that means he's guilty of murder."

15

arguments concerning the alleged pervasive prosecutorial misconduct because he did not cite any authority for his contentions that certain actions constituted misconduct, we do not address his claim of ineffective assistance of counsel for the same reason. The claim of ineffective assistance of counsel requires defendant to demonstrate counsel's conduct fell below an objective standard of professional reasonableness and that he was prejudice by the failure. (*In re Alvernaz* (1992) 2 Cal.4th 924, 936-937.) But as defendant has not cited authority for the proposition the prosecutor committed misconduct on a number of occasions, he not only has forfeited the issue of pervasive prosecutorial misconduct, he has failed to demonstrate counsel's failure to object was unreasonable.

B. *Jury Instruction*

Defendant argues the court prejudicially erred by failing to instruct the jury that assault is a lesser included offense of attempted murder with a knife. We disagree.

Whenever there is substantial evidence the defendant is guilty only of a lesser included offense, the court must instruct on the lesser offense even if the defendant fails to request the instruction. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414.) The corollary to the rule is: there is no sua sponte duty to instruct on a lesser included offense if "there is no evidence that the offense was less than that charged. [Citations.]" (*People v. Ghent* (1987) 43 Cal.3d 739, 757.) We view the evidence most favorably to the defendant in deciding whether the court was required to instruct on a lesser included offense. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 796.)

In determining whether a crime is a necessarily included lesser offense, "courts apply the so-called '"accusatory pleading"' test, which 'looks to whether ""the charging allegations of the accusatory pleading include language describing the [charged] offense in such a way that if committed as specified [the proposed] lesser offense is necessarily committed."""' [Citations.]" (*People v. Alarcon* (2012) 210 Cal.App.4th

16

432, 436, fn. omitted.) The indictment charged defendant with attempted murder, and further alleged defendant not only used a knife in the course of committing the offense, he personally inflicted great bodily injury during the offense. Assuming for purposes of argument that assault is a lesser included offense of attempted murder *as alleged* in the information, defendant's argument must fail because substantial evidence did not support the instruction in this case.

According to defendant, the instruction should have been given because his friend Hudson testified that after defendant flicked his cigarette, someone approached defendant and there was a shoving match between defendant and that individual before "four or five of the other man's friends . . . started throwing punches and fighting." Defendant claims this evidence required the court to instruct on simple assault: "What Hudson described, generally, was a fight between [defendant] and five other people, in which [defendant] was unarmed and did not use or possess a knife."

There are three flaws with defendant's argument. First, the evidence was overwhelming that defendant had a knife that night and stabbed Sickles and McTeigue. Defendant admitted the knife was the same type and brand he owned. He said he uses the knife when he goes fishing, and he had intended on fishing earlier that day. Additionally, when he got out of jail prior to trial, he went through his personal effects to look for his knife and did not find it. Moreover, there was no evidence this brawl involved anyone other than the victims, their friends, and defendant. Thus, there is no reason to believe anyone other than defendant did the stabbing. Sickles's friends did not stab Sickles in his chest.

Second, Hudson did not say the brawl was initiated by defendant. According to Hudson, the fight started when one of the victims, or whoever the person

17

was who purportedly approached defendant under Hudson's trial version of the incident.[2] Hudson did not say defendant committed an assault. Lastly, assuming defendant did not have the intent to kill when the melee began, the attempted murder with the knife involved a different *act* than those acts involved in the earlier shoving match, which either occurred as Hudson said or when defendant charged Hanlin, as Sickles's friends testified. When the charged crime and the lesser offense involve different acts, the lesser offense is not a lesser *included* offense. (*People v. Sanchez* (1989) 208 Cal.App.3d 721, 748.)

Because we have addressed the issue without requiring counsel to have requested the instruction (§ 1259 [court may consider question of law without requiring an objection or request by defendant in the trial court, if the question involves the substantial rights of the defendant]), there is no need to address defendant's ineffective assistance of counsel claim based on counsel's failure to request the assault instruction.

C. *Unauthorized Sentence*

As noted above, the court sentenced defendant to 15 years to life on the murder conviction and added a one-year consecutive term for his use of a deadly weapon (a knife) in the commission of the murder. The court then proceeded to sentence defendant on the attempted murder and the knife use enhancement attached to that offense. In selecting the term on the attempted murder, the court ordered defendant to serve one-third the middle term of seven years (two years and four months) plus a consecutive term of four months (one-third the term prescribed by section 12022, (b)(1)) for the use of a knife. The sentence imposed on the attempted murder and the attached weapon use enhancement was unlawful. (*People v. Neely* (2009) 176 Cal.App.4th 787,

---

[2] When Hudson testified earlier at the grand jury hearing when his memory of the incident was better, his testimony conflicted with his trial version. At the grand jury, Hudson said defendant was the one who approached Sickles's half brother.

18

799.)  Accordingly, the matter must be remanded to the trial court for resentencing on the attempted murder and the section 12022, subdivision (b)(1) enhancement found true in connection with the attempted murder.

The penalty for second degree murder is 15 years to life in prison.  (§ 190, subd. (a).)  The penalty for attempted murder without deliberation and premeditation is a determinate term of five, seven, or nine years.  (§ 664, subd. (a).)  When a court sentences a defendant to an indeterminate term for murder, the court sentences the defendant pursuant to section 190.  On the other hand, when the court sentences a defendant for a crime carrying a determinate term of punishment, the court sentences under sections 1170 and 1170.1.  (*People v. Neely*, *supra*, 176 Cal.App.4th at p. 797.)  "Sentencing under these two sentencing schemes must be performed separately and independently of each other.  [Citation.]  Only after each is determined are they added together to form the aggregate term of imprisonment." (*Ibid.*)  The *Neely* court conceptualized sentencing on crimes subject to indeterminate terms and crimes subject to determinate terms as involving two separate boxes.  In the first box, the court calculates the sentence on the crimes subject to indeterminate sentences.  In the second box, the court sentences defendant on the crimes carrying determinate punishments.  (*Id.* at p. 798.)  The term of the sentence on crimes carrying a determinate term is calculated without regard to the sentence imposed under section 190.  (*Ibid.*)  Only after the court has calculated the separate indeterminate and determinate terms does the court decide whether the determinate term will be served concurrently or consecutively to the indeterminate sentence.  (*Id*. at p. 799.)

Thus, the court's imposition of one-third of the middle term for attempted murder and one-third the term for using a knife was error.  The court's obligation was to impose either the low, middle, or upper term on the conviction for attempted murder.  (§ 1170.1, subd. (a).)  Then, the court was required to either impose a consecutive one-year

19

term for the section 12022, subdivision (b)(1) enhancement attached to that offense (§ 1170.1, subd. (d)), dismiss the enhancement, or strike the one-year term pursuant to section 1385.[3] (See *People v. Haykel* (2002) 96 Cal.App.4th 146, 151.) Only after calculating the determinate term in this matter does the court then order the determinate term to be served concurrently or consecutively to the indeterminate term. On remand, the court shall recalculate the determinate sentence and determine whether the sentence will run consecutively or concurrently with the indeterminate term the court imposed on count one.

III

DISPOSITION

The sentence on count two is reversed. The matter is remanded for the court to resentence defendant on count two. After the court has resentenced defendant, the clerk of the superior court is directed to mail a certified copy of the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

MOORE, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.

---

[3] "If the court has the authority pursuant to subdivision (a) to strike or dismiss an enhancement, the court may instead strike the additional punishment for that enhancement in the furtherance of justice in compliance with subdivision (a)." (§ 1385, subd. (c)(1).)