[No. D032206. Fourth Dist., Div. One. Jan. 4, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE STEWART, JR., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*\*This opinion is certified for publication with the exception of parts II, IIIC. and IV.*

## COUNSEL

Jeffrey J. Stuetz, under appointment by the Court of Appeal; and Waldemar D. Halka for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle M. Boustany and Jean Hume, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, J.**—A jury convicted Willie Stewart, Jr. (Stewart) of assaulting a child under the age of eight years in his custody and care by means of force that to a reasonable person would be likely to produce great bodily injury (GBI) resulting in the child's death. (Pen. Code § 273ab.[1]) Subsequently, the trial court found true Stewart had suffered two out-of-state serious felony convictions (§§ 667, subd. (a)(1), 1192.7, subd. (c)(8) & (23)) and that those same priors constituted strikes under the three strikes law. (§§ 667, subds. (b)-(i), 1170.12.) The court sentenced Stewart to a total term of 80 years to life.

Stewart timely appealed. In addition to challenging the sufficiency of the evidence to support his conviction, Stewart contends the trial court committed reversible error by admitting evidence of an earlier act of violence toward the child he killed and by failing to sua sponte instruct the jury on the lesser included offenses of involuntary manslaughter, second degree felony murder, simple assault, assault by means of force likely to produce GBI and battery. He also asserts the true findings regarding his Florida priors must be reversed because there was insufficient evidence they constituted "serious" felonies in California under section 1192.7, subdivision (c)(8) and (23) and the court erroneously admitted into evidence the Florida complaint to prove up such priors. Finally, Stewart complains a 25-year-to-life sentence under section 273ab constitutes cruel and/or unusual punishment because such unintentional killings are punished as severely or more severely than other homicides. We affirm Stewart's convictions and the true findings based on his Florida conviction for aggravated assault with a deadly weapon. We reverse the true findings based on his Florida prior conviction for attempted

---

[1]All statutory references are to the Penal Code unless otherwise specified.

robbery with a deadly weapon, vacate his sentence and remand the matter for further proceedings consistent with our opinion.

DISCUSSION

I

*Sufficiency of the Evidence*

■   Because Stewart challenges the sufficiency of the evidence to support his section 273ab conviction, we have viewed the facts adduced at trial in full and in the light most favorable to the judgment, drawing all inferences in support of the judgment. (*People v. Silva* (1988) 45 Cal.3d 604, 625 [247 Cal.Rptr. 573, 754 P.2d 1070]; *People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We resolve the issue based upon the entire record and determine whether there is substantial direct or circumstantial evidence of the convicted offenses. (*People v. Towler* (1982) 31 Cal.3d 105, 118 [181 Cal.Rptr. 391, 641 P.2d 1253]; *People v. Johnson, supra,* 26 Cal.3d at p. 577.) The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusion. (*People v. Arcega* (1982) 32 Cal.3d 504, 518 [186 Cal.Rptr. 94, 651 P.2d 338].)

In making our determination, we do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact. (Evid. Code, § 312.) We simply consider whether " ' "*any* rational trier of fact could have found the essential elements of [Stewart's crime] beyond a reasonable doubt." ' [Citations.]" (*People v. Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960], original italics.) Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the [jury's] verdict[s,]" we will not reverse. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429 [180 Cal.Rptr. 391].)

Here, the record before the jury, viewed in accordance with these rules, showed that about 12:48 a.m. on May 1, 1998, Oceanside police officers responded to Stewart's 911 call requesting aid for a child who had stopped breathing. The officers found Stewart in the living room of his apartment, holding a telephone between his shoulder and ear, and kneeling on the floor next to a small child who was lying on his back and clothed only in a diaper. Stewart was talking excitedly with the 911 dispatcher while pushing on the child's chest, as if doing CPR.

When Stewart failed to respond to an officer's questions about what had happened, he pushed Stewart out of the way, checked on the child's vital

signs and attempted further CPR on the child. The child's eyes were droopy, partly open and dilated; his skin was cold and stiff; he was not breathing; there were bruises on his forehead; and there was a pinkish-colored mucous fluid on the child's face, neck and chest. Paper towels with the same substance were strewn on the kitchen and living room floors. There were also bloody tissues and napkins on the floors and the kitchen counter of the apartment. The officer opined the child had been dead for some time, about an hour or so.

Within minutes of the police officers' arrival, a captain and a paramedic with the Oceanside Fire Department appeared on the scene and took over efforts to resuscitate the child and talked with Stewart. Stewart told them that the child, named Demarcus Celestine, Jr., was "roughhousing" with his brother Kyle, had fallen off a coffee table, "bumped" his head and had been unconscious for about 10 minutes. This explanation did not seem accurate to the paramedic because Demarcus appeared to have been dead for some time and no coffee table was found in the apartment.

When Stewart was further questioned, he stated he had found Demarcus unconscious when he went to check on him as he slept in bed. The fire captain felt Stewart was not directly answering the questions about what had happened. When the paramedic determined Demarcus had been in cardiac arrest for about 45 minutes and could not be resuscitated, CPR was stopped; Stewart then became agitated, pleading with him to continue efforts to revive Demarcus. Demarcus was declared dead at the apartment.

Stewart's sister, who lived next door to Stewart and the child's mother, called the mother at her work and told her there was a problem at home. The mother, Jennifer Celestine (Mother), a certified nurse's assistant, arrived home several minutes later and was told Demarcus was dead. When questioned about his health, Mother told Dr. Christine Stanley, the San Diego County deputy medical examiner, who was at the scene, that Demarcus had several bruises on his legs, chest and arms from being elbowed by his older brother while playing rough.

Stanley, who had examined Demarcus at the apartment, performed an autopsy on his body over the next two days, May 2 and 3, 1998, and concluded the cause of his death was pulmonary edema resulting from brain damage and swelling. The autopsy showed that Demarcus, who was two and one-half years old at the time of his death, weighed 43 pounds and was 37 inches tall, and had four separate bruises across his forehead, plus three in his hairline, several near his right eye, a bruise on top of his right ear and an abrasion on the top of his head. On the back of his head, there were five

separate bruises and a large area of at least 12 overlapping bruises. There were also bruises on his chin, on his left jaw, bruising opposite his teeth, three bruises on the side of his neck, others on the back of his neck, several on his right shoulder, elbow, top and back of his forearm, on his right abdomen, on his back over the "wings," the small of his back and his tailbone, on his upper left leg below the buttocks, on the front and back of his thighs, and numerous bruises on his shins and knees. Stanley also found bruising on the inside of Demarcus's back, which could be explained by his back being slammed down onto a flat surface.

Demarcus had over 60 bruises, some of which were older, but most of which were less than 24 hours old. Of these, 24 or 25 reflected separate impact sites on the back of his head, implying nonaccidental trauma. The sheer number of overall bruises was only consistent with nonaccidental trauma or child abuse and totally inconsistent with a fall within the apartment.

Demarcus also had a tear and bleeding in his mouth on the lower "frenulum," the tissue that holds the lip to the gum line, an injury "classic for child abuse." He also had a one-eighth inch cut inside the corner of his mouth and had hemorrhages in the soft tissues of his neck, the broad bone area of the upper back and in back of one eye. His scrotum was red and swollen, with abrasions on the underside of his penis and a fresh hemorrhage surrounded his left testicle. Although Demarcus's skull was not fractured, Stanley explained that his brain had swollen so much it pulled apart the sutures that fuse together to close the "soft spot" in a baby's head.

Stanley opined Demarcus died due to the injuries to his brain. She noted such injuries were similar to those seen when a child is thrown from a car or hit by an air bag at 200 miles per hour in an automobile accident or from the force of impact in a New York City high-rise building fall. She concluded Demarcus died from repeated blunt force blows to the back of his head or severe shaking. She explained Demarcus's death could have been caused by the cumulative effect of repeated "moderate" blows or one or more "may have been tremendous." Although she could not determine the exact cause of the injuries, she noted their pattern was consistent with Demarcus's head being hit multiple times against the floor or against an object like a countertop. She termed his death a homicide.

As a result of his brain injuries, Demarcus developed pulmonary edema, which caused his heart to beat improperly and fluid to back up in his lungs. Additionally, blood-tinged fluid, which matched that on the tissues and paper towels in the apartment, came out through his mouth and nose. Based

on the severity of his brain injuries, the onset of these symptoms would have taken place within minutes and Demarcus would not have been able to eat, walk or talk. At the time Stanley examined Demarcus's body, it was very clean, as if he had just been bathed, and his bladder and diaper were urine free, which were unusual circumstances in the case of pulmonary edema.

Stewart was charged in this case for Demarcus's death. In addition to the presentation of the above evidence, Mother, Demarcus's brother and several neighbors testified at trial. Mother stated she had met Stewart in February 1998 and he had moved in with her and her two sons at the end of March. Because mother worked 12-hour night shifts three nights a week at a board and care home, Stewart would baby-sit the children during that time. When Mother left her children in Stewart's care on April 30, 1998, about 6:45 p.m., they were eating dinner in the apartment. She called home after receiving a page from Stewart at 7:33 p.m. He told her the boys were "doing karate" and Demarcus had vomited. She could hear the boys in the background. Mother called back at 9:00 p.m. to check on everyone. She talked with the boys, who both sounded "fine." At 10:30 p.m. Mother received another page from home. When she returned the call, Stewart did not say anything to cause her concern and she did not hear the boys in the background as before. About 1:00 a.m. she received calls from Stewart's sister and a deputy sheriff to return home.

Demarcus's brother, who was five years old, testified he heard Demarcus loudly crying a "different" cry than usual in the living room that night while he was in bed watching the *Flintstones* television program. He also heard loud noises and someone "throwing up." Stewart was also in the living room with Demarcus at that time. Stewart had gotten angry with Kyle earlier that night about not turning on the shower before he helped him shower and get ready for bed. The parties stipulated the *Flintstones* aired between 10:00 and 10:30 p.m. that night.

Two women who lived in an apartment with the same floor plan directly below Mother and Stewart's apartment testified that between 9:45 and 10:00 p.m. on April 30, 1998, they heard an exceptionally loud "thump" in the living room area in the apartment above. After one woman left the apartment between 10:15 and 10:30 p.m., the other heard crying and a high-pitched scream in the kitchen area of the apartment above, which suddenly stopped after 10 to 15 seconds. About an hour later, she head another loud thump, as if something had been thrown on the floor, followed by a rumble or rolling sound by the front door area of the above apartment. After about 15 more minutes, she heard an even louder thump near the upstairs apartment's balcony door.

Over defense objections, another apartment tenant was allowed to testify that nearly two months before Demarcus's death, she heard Stewart yelling at Demarcus to go faster down some concrete stairs outside his apartment and saw him then push Demarcus in the buttocks area with his foot causing him to tumble and fall down the last four steps. As Demarcus was crying, Stewart noticed the tenant nearby and told Demarcus, "If you wouldn't have ran down the stairs you wouldn't have fallen like that."

The jury subsequently determined Stewart had violated section 273ab by assaulting Demarcus with such force as to cause his death. Such section specifically provides in pertinent part: "Any person who, having the care or custody of a child who is under eight years of age, assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life." ▮ To prove this crime, four elements must be shown: "1. [a] person had the care and custody of a child under eight years of age; [¶] 2. [t]hat person committed an assault upon the child; [¶] 3. [t]he assault was committed by means of force that to a reasonable person would be likely to produce great bodily injury; and [¶] 4. [t]he assault resulted in the death of the child." (CALJIC No. 9.36.5; *People v. Preller* (1997) 54 Cal.App.4th 93, 97-98 [62 Cal.Rptr.2d 507].)

▮ As he did below, Stewart challenges only the sufficiency of the evidence as to the third element, arguing there was no evidence presented at trial to establish a reasonable person would be likely to know "shaking or hitting a child with rapid, 'moderate' force" would produce GBI. We disagree. One need only look to the entirety of the expert testimony describing the extent of Demarcus's injuries and the force necessary to produce them to find substantial evidence to support such element.

▮ As the court in *Preller* noted, the Legislature has demonstrated its intended interpretation of this third element "referred to the force of the assault on the child, not to the quality of bodily injury contemplated by the reasonable person." (*People v. Preller, supra,* 54 Cal.App.4th 93, 98.) To support this element there must be evidence of force used that will "be likely, in the mind of a reasonable person, to produce great bodily [injury] and the force must result in the child's death." (*Ibid.,* italics omitted.) Thus "the prosecution need not prove that a reasonable person would believe the means of force would be likely to result in the child's death." (*Ibid.*)

▮ Here, Stanley's testimony concerning the severity of Demarcus's injuries belies Stewart's claim there was insufficient evidence of violence in his assaults on Demarcus from which a reasonable person would believe

likely to produce GBI. Regardless whether the exact cause of Demarcus's injuries is known, Stanley testified they were either caused by rapid, "violent" shaking which includes "the rattling of the brain slamming against the skull with all these different impacts[,]" or by the cumulative effect of rapid, repeated blows with one or two "tremendous" ones, leaving at least 24 or 25 bruises on the back of his head. A reasonable person would clearly know that either of such described actions would likely produce GBI on a small child. Stewart's assertions otherwise are specious. Simply, no further expert testimony was necessary to show the force necessary under section 273ab. Substantial evidence supports the jury's verdict.

## II

### *Evidence of Prior Acts*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III

### *Lesser Included Offenses*

Stewart next raises five separate arguments regarding the trial court's failure to instruct the jury on purported lesser included offenses to section 273ab. ■ The general rule is that in a criminal case the trial court must, on its own motion, even without request, instruct the jury on all general principles of law relevant to the issues raised by the evidence. (*People v. Hood* (1969) 1 Cal.3d 444, 449 [82 Cal.Rptr. 618, 462 P.2d 370].) Further, because section 1159 provides that a jury may find a defendant guilty of any offense, the commission of which is necessarily included in the charged offense, the court must also sua sponte instruct fully on all lesser necessarily included offenses supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 161 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

■ An offense is a lesser included offense of another for purposes of section 1159 if it meets either of the following tests: 1) "Legal elements" test: The greater statutory offense cannot be committed without committing the lesser offense because all the elements of the lesser offense are included in the elements of the greater; 2) "Accusatory pleadings" test: The charging allegations of the accusatory pleading include language describing the offense in such a way that if committed in that manner the lesser offense must necessarily be committed. (*People v. Clark* (1990) 50 Cal.3d 583, 636 [268 Cal.Rptr. 399, 789 P.2d 127].) It is error, however, to instruct on a lesser

---

\*See footnote, *ante*, page 785.

included offense when a defendant, if guilty at all, could only be guilty of the greater offense, i.e., when the evidence, even construed most favorably to the defendant, would not support a finding of guilt of the lesser included offense but would support a finding of guilt of the offense charged. (*People v. Hawkins* (1995) 10 Cal.4th 920, 954 [42 Cal.Rptr.2d 636, 897 P.2d 574].) Any error in instructions on a lesser included offense in a noncapital case is subject to the *Watson* standard of review requiring reversal only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of such error. (*People v. Breverman, supra,* 19 Cal.4th at p. 165.)

We apply these rules in turn to Stewart's specific contentions of instructional error.

## A.

### Involuntary Manslaughter

■ Stewart's assertion the trial court prejudicially erred in not sua sponte instructing the jury on involuntary manslaughter as a lesser included offense of section 273ab has been resolved against him in *Orlina v. Superior Court* (1999) 73 Cal.App.4th 258 [86 Cal.Rptr.2d 384] (review den. Oct. 20, 1999). The court in *Orlina* found that involuntary manslaughter is a lesser related offense of section 273ab rather than a lesser included offense for which the rules of sua sponte instruction apply. (73 Cal.App.4th at p. 262.) We agree with the analysis and conclusion in *Orlina*. The trial court simply did not have a sua sponte duty to instruct on involuntary manslaughter in this case.

## B.

### Second Degree Felony Murder

■■ ■ Stewart next claims the trial court committed reversible error by not sua sponte instructing the jury on the lesser included offense of second degree felony murder[4] based on child abuse or assault by force likely to produce great bodily injury. ■ He bases this contention on the

---

[4]Under the long recognized felony-murder rule in California, an intentional or unintentional killing is first degree murder if committed in the perpetration of or attempt to perpetrate certain serious felonies, such as arson, rape, robbery and burglary. (See § 189.) The rule eliminates the elements of malice and premeditation from first degree murder, making the only criminal intent necessary for the doctrine to apply, the specific intent to commit the particular felony. (*People v. Dillon* (1983) 34 Cal.3d 441, 463, 472 [194 Cal.Rptr. 390, 668 P.2d 697]; *People v. Poddar* (1974) 10 Cal.3d 750, 755 [111 Cal.Rptr. 910, 518 P.2d 342].)

premise the jurors could have concluded that to a reasonable person, the assault was not likely to result in GBI. We agree with the People these assertions fail because such instructions would have violated the merger doctrine set forth in *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].

■ In *Ireland*, our Supreme Court restricted the scope of the felony-murder rule, declaring it inapplicable to those felonies that are an integral part of, and included in fact within, the homicide. (*People v. Ireland, supra,* 70 Cal.2d at p. 539.) In *People v. Burton* (1971) 6 Cal.3d 375 [99 Cal.Rptr. 1, 491 P.2d 793], our Supreme Court revisited and refined the *Ireland* rule, noting that the felony-murder rule may nonetheless apply where the underlying felony is committed with an "independent felonious purpose." (*People v. Burton, supra,* 6 Cal.3d at p. 387.) Thus, even where the underlying felony is included within the facts of the homicide and is an integral part thereof, further inquiry is needed to determine if the killing resulted "from conduct for an independent felonious purpose" rather than from a "single course of conduct with a single purpose." (*Ibid.*) In *Ireland*, the purpose of the defendant's conduct was "the very assault which resulted in death[,]" whereas, there was an independent felonious purpose to acquire money or property belonging to another in *Burton* where the defendant attempted an armed robbery and killed one person in the process. (*People v. Burton, supra,* 6 Cal.3d at p. 387.)

Subsequently, when our Supreme Court again visited the merger rule of *Ireland* in *People v. Hansen* (1994) 9 Cal.4th 300 [36 Cal.Rptr.2d 609, 885 P.2d 1022], it noted such rule has not been extended beyond the context of assault "even under circumstances in which the underlying felony plausibly could be characterized as 'an integral part of' and 'included in fact within' the resulting homicide." (*Id.* at p. 312.) ■ In so doing, however, the court specifically mentioned *People v. Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886], which considered felony child abuse of the assaultive category, as an appropriate case where the merger rule of *Ireland* would apply.

In *Smith*, the court had used the principles established in *Ireland* and *Burton* to find the felony-murder rule would not apply because there was willful infliction of "unjustifiable physical pain on a child" in the assault that resulted in the death of a child, and "[i]t would be wholly illogical to allow this kind of assaultive child abuse to be bootstrapped into felony murder merely because the victim was a child rather than an adult, as in *Ireland.*" (*People v. Smith, supra,* 35 Cal.3d at pp. 806-807.)

Although *Smith* involved a violation of section 273a, former subdivision (1), rather than section 273ab, as in this case, we see no reasonable difference in the application of the *Ireland* merger rule to this case, where the

assault likely to produce GBI, or the child abuse, was an integral part of Demarcus's death. Quite simply, because the underlying felonious conduct is not independent of an assault that results in death, the killing is outside of the felony-murder rule. (*People v. Luparello* (1986) 187 Cal.App.3d 410, 436 [231 Cal.Rptr. 832].) That being so, there was no duty for the court to instruct the jury on such rule as a lesser included offense of section 273ab.[5]

### C.

*Assault, Assault by Means of Force Likely to Produce GBI and Battery*\*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### IV

*Sentencing Issues*\*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### DISPOSITION

The convictions and true findings that Stewart's prior aggravated assault with a deadly weapon constituted a strike and a serious felony conviction for enhancement purposes are affirmed. The true findings that Stewart's prior attempted robbery with a deadly weapon constituted a strike and a serious felony conviction for enhancement purposes are reversed. Accordingly, the sentence in this matter is vacated and the matter remanded for further proceedings and resentencing.

Work, Acting P. J., and Haller, J., concurred.

On January 21, 2000, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied April 12, 2000. Mosk, J., was of the opinion that the petition should be granted.

---

[5]Because we find it would have been improper for the court to instruct the jury in this case on the felony-murder rule, we find it unnecessary to determine whether second degree felony murder is a lesser included offense of section 273ab.

\*See footnote, *ante*, page 785.