Filed 4/7/16  P. v. Gonzalez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066895 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD251515) |
| ANGEL GONZALEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

Dacia A. Burz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

Angel Gonzalez appeals a judgment following his jury conviction of one count of attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] and one count of discharging a firearm at an occupied vehicle (§ 246) and true findings on allegations each offense was committed to promote a criminal street gang (§ 186.22, subd. (b)) and that a principal to the offense personally used a firearm and inflicted great bodily injury (§ 12022.53, subds. (d), (e)(1)).  In a bifurcated bench trial, the trial court found true allegations Gonzalez had two prison priors (§§ 667.5, subd. (b), 668), one prior serious felony conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and one prior strike conviction (§§ 667, subds. (b)-(i), 668, 1170.12).  On appeal, Gonzalez contends: (1) the trial court erred by refusing to instruct on attempted voluntary manslaughter as a lesser included offense (LIO) of attempted murder based on a theory of imperfect self-defense; (2) the court erred by not instructing sua sponte on self-defense; (3) the prosecutor committed prejudicial error by misstating the law during closing argument; and (4) to the extent his counsel forfeited or waived that error by not objecting below, he was denied effective assistance of counsel.

FACTUAL AND PROCEDURAL BACKGROUND

At about 6:00 p.m. on September 30, 2012, Gonzalez, Clarissa Lopez, and her sister Priscilla arrived at the Korner Market in the Paradise Hills neighborhood of San Diego in Gonzalez's blue pickup truck.  They went inside the store to get something to drink and play a video poker game.  Two Paradise Hills gang members, whom Lopez

---

[1]     All statutory references are to the Penal Code.

described at trial as "youngsters," were also in the store.[2] The gang members began to challenge Gonzalez, who had several tattoos showing he was an Old Town National City (OTNC) gang member, and called him a "nalgero," a disrespectful term for someone from National City. They also yelled at Lopez, calling her by her former nickname, Mousy, and threatened to beat her up for being with Gonzalez. Gonzalez calmly walked away from them and left the store with Lopez and Priscilla.[3]

Gonzalez, Lopez, and Priscilla got into his pickup truck, but an SUV stopped behind it, preventing them from leaving. The SUV was driven by Jose Ramirez, a Paradise Hills gang member with the nickname, Bugsy, with whom Lopez had gone to high school. Lopez used to be good friends with Ramirez's wife, but had not associated with her or Ramirez since 2012. Gonzalez got out of his truck and spoke to Ramirez. He told Ramirez, "I'm Angel Vargas from OTNC."[4] Ramirez replied, "okay, okay," and then shook Gonzalez's hand. Ramirez then moved his SUV and Gonzalez, Lopez, and Priscilla drove away in the truck.[5] They picked up some food and went to a friend's

---

[2]    In 2002 and 2003, Lopez had "hung out" with Paradise Hill gang members, but stopped associating with them as she grew older.

[3]    Lopez testified at trial that Gonzalez behaved that way to, at least in part, protect her and her sister.

[4]    Vargas is Gonzalez's middle name.

[5]    Lopez testified at trial that Gonzalez did not appear angry about the incident as they drove away.

house to eat.  Gonzalez drove away in his truck, leaving Lopez and Priscilla at the friend's house.

Marwan Azabo, whose family owned the Korner Market store, was working behind the counter that evening.  He knew Lopez, Priscilla, and the two Paradise Hills gang members.  Azabo saw the gang members confront Gonzalez, Lopez, and Priscilla and ask Gonzalez in an angry way, "Where are you from?"  The verbal exchange lasted about two to three minutes.  Azabo heard one of the gang members tell the other one, "Call Bugsy," and the other one was making a call as they drove away from the store. Azabo had known Bugsy for about six years.

About 35 minutes after leaving the store, Gonzalez returned in his blue truck, driving it in and out of the parking lot three or four times.  Azabo heard four loud gunshots and called 911.  Rodolfo Carbajal, a neighbor, heard the gunshots, looked outside, and saw a Dodge extended cab pickup truck with a man trying to get in through the passenger's door, but having difficulty getting into the back seat because another passenger was sitting in the front seat.  People inside the truck were shouting at the man. Carbajal could not see the driver.  He saw the truck drive away.  Briana Miranda, another neighbor, heard four or five gunshots, looked outside, and heard and saw a blue truck "screeching" out of the store's parking lot at a high speed.

Ramirez was driving his SUV down a street past the store when he was shot.  He felt something in the middle of his back and saw one of his windows was shattered, so he drove home.  He did not hear any shots because his radio was loud and did not see the

4

shooter. On arriving home, his wife drove him to the hospital. Doctors could not remove the bullet fragments, which remain lodged near his spine.

After the shooting, police investigators found an expended bullet fragment on the sidewalk near the store. Photographs were taken of a bullet embedded in the front passenger door of Ramirez's SUV, a dent from a bullet strike in the rear passenger door, and a shattered rear passenger window. Blood was found on the middle of the driver's seat.

Video recordings from the store's surveillance cameras showed a blue pickup truck in the parking lot at about 6:00 p.m. and 6:50 p.m. that evening. It had unique characteristics that matched Gonzalez's blue Dodge Dakota pickup truck.

An information charged Gonzalez with one count of attempted murder (§§ 664, 187, subd. (a)) and one count of discharging a firearm at an occupied vehicle (§ 246) and alleged each offense was committed to promote a criminal street gang (§ 186.22, subd. (b)) and that a principal to the offense personally used a firearm and inflicted great bodily injury (§ 12022.53, subds. (d), (e)(1)). It also alleged Gonzalez had two prison priors (§§ 667.5, subd. (b), 668), one prior serious felony conviction (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)), and one prior strike conviction (§§ 667, subds. (b)-(i), 668, 1170.12).

At trial, the prosecution presented evidence substantially as described above. It also presented the testimony of San Diego Police Officer Damon Sherman, who is assigned to the gang unit and identified the two young Paradise Hills gang members shown in the store's surveillance recordings as Ruben Morales and Adrienne Aiala. Morales and Aiala were both active members in the Paradise Hills criminal street gang.

5

The store is located in territory claimed by the Paradise Hills gang. The prosecution presented the testimony of another police officer who stated Gonzalez admitted to him in November 2011 that he was a member of the OTNC criminal street gang. In November 2012, while in federal custody, Gonzalez stated he had been a member of the OTNC gang for 15 years.

National City Police Detective Mark Segal testified as the prosecution's gang expert witness. OTNC is a criminal street gang with about 400 members and is one of the largest gangs in San Diego County. Its territory covers the west side of National City. One of OTNC's primary rival gangs is the Paradise Hills gang. Segal testified that "respect is everything" for criminal street gangs and respect is synonymous with committing violent acts and causing fear. Gang members earn respect by committing crimes for the benefit of the gang and more serious crimes earn more respect. Disrespect for a rival gang is shown by going into a rival gang's territory, especially when displaying one's gang tattoos. Asking where one is from or flashing a gang hand sign also shows disrespect of a rival gang.

Segal had known Gonzalez for about eight years. Gonzalez was about 40 years old and had OTNC tattoos, including ones that displayed "Old Town, Old Town NC, National City," and the numbers 15 and 20, which reference the letters O and T, the 15th and 20th letters of the alphabet. Gonzalez had repeatedly claimed to be an OTNC gang member. In Segal's opinion, Gonzalez was an active member of the OTNC criminal street gang.

6

When a gang member is disrespected, retaliation is required and more violent retaliation earns more respect individually and also for the gang. More respect is earned if a crime is committed in a rival gang's territory. It is not unusual for a disrespected gang member to enlist other gang members to assist in retaliation, thereby increasing the chance for successful retaliation and providing a witness to vouch for it. By returning in the same vehicle, Gonzalez sent messages to rival gang members that he wanted them to know who he is and that he was not afraid to go into their territory.

In general, gang violence does not occur when females are present in order to protect them. Segal had never heard of a criminal street gang using a female to commit violence or help in retaliation. Gonzalez's full name is Angel Vargas Gonzalez and his family is well known in National City and within the OTNC gang. By using the name Vargas, Gonzalez told Ramirez that it was not just a one-on-one situation, but he (Ramirez) was taking on all of OTNC. In Segal's opinion, Gonzalez committed the instant offenses to promote and assist the OTNC gang.

In Gonzalez's defense, he presented the testimony of an investigator who stated that during a 90-minute period beginning at 6:00 p.m. in April 2014, 709 vehicles passed through the intersection by the store, nine of which were blue pickup trucks, and two blue pickup trucks were parked nearby.

The jury found Gonzalez guilty of the two charged offenses and found true the allegations related to those offenses. In a bifurcated trial, the trial court found true the prior prison term and prior felony conviction allegations. At sentencing, the court denied Gonzalez's motion to strike the true finding on the prior "strike" allegation pursuant to

7

*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 and sentenced him to a determinate term of 14 years to life in prison on count 1 and an indeterminate term of 25 years to life for the related firearm use enhancement.  It also imposed a five-year term for the prior serious felony enhancement and two 1-year terms for the prior prison enhancements.  The court stayed punishment for count 2 and its related enhancements pursuant to section 654.  Gonzalez timely filed a notice of appeal.

DISCUSSION

I

*Refusal to Give Requested Instruction on Attempted Voluntary Manslaughter as an LIO of Attempted Murder Based on Theory of Imperfect Self-defense*

Gonzalez contends the trial court erred by denying his request for an instruction on attempted voluntary manslaughter as an LIO of attempted murder based on a theory of imperfect self-defense.  He argues there was sufficient evidence to support his defense theory that Lopez was the shooter and shot Ramirez in the good faith belief in the need to defend herself.

A

During discussions regarding proposed jury instructions, Gonzalez's counsel requested that the trial court instruct on attempted voluntary manslaughter based on a theory of imperfect self-defense.  His counsel argued Lopez could have been the shooter because the evidence supported inferences she was threatened by the Paradise Hills gang members in the store, they called Ramirez (who then blocked Gonzalez's truck), and Lopez may have felt she was in imminent danger when she later returned to the area and

8

saw Ramirez's SUV. The court denied the request for an instruction on attempted voluntary manslaughter as an LIO of attempted murder based on a theory of imperfect self-defense, finding there was an insufficient evidentiary basis to give that instruction.

B

"The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." (*People v. Cooper* (1991) 53 Cal.3d 771, 827.) An instruction on an LIO is not required when there is no evidence to support a finding that the LIO was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) Alternatively stated, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support." (*Id*. at p. 162.) "[A] trial court is not required to instruct the jury as to all lesser included offenses, only those that 'find substantial support in the evidence.' " (*People v. Medina* (2007) 41 Cal.4th 685, 700.) In determining whether a trial court erred in not giving an attempted voluntary manslaughter LIO instruction, we consider de novo whether there was substantial evidence to support a verdict on that LIO. (*Ibid*.; *Breverman*, at p. 162; *People v. Manriquez* (2005) 37 Cal.4th 547, 584-585.) "It is error . . . to instruct on a lesser included offense when a defendant, if guilty at all, could only be guilty of the greater offense, i.e., when the evidence, even construed most favorably to the defendant, would not support a finding of guilt of the lesser included offense but would support a

9

finding of guilt of the offense charged." (*People v. Stewart* (2000) 77 Cal.App.4th 785, 795-796.) Substantial evidence to support an instruction on an LIO is evidence from which a jury composed of reasonable persons could conclude the lesser offense, but not the greater, was committed. (*Breverman*, at p. 162.) In deciding whether there is substantial evidence, we do not evaluate the credibility of witnesses and construe the evidence most favorably to the defendant. (*Ibid*.)

"Under California law, a lesser offense is necessarily included in a greater offense if . . . the statutory elements of the greater offense . . . include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117.) In the context of this case, an instruction on attempted voluntary manslaughter as an LIO of attempted murder should be given if there is substantial evidence the principal acted with an actual or honest, but unreasonable, belief in the need to defend him- or herself against imminent peril to life or great bodily injury.[6] (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262; *People v. De Leon*, *supra*, 10 Cal.App.4th at p. 824.)

In a noncapital case, the *Watson* standard of prejudice applies when considering a trial court's error in failing to instruct on an LIO supported by substantial evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *Breverman*, *supra*, 19 Cal.4th at

---

[6]    In contrast, reasonable, or "perfect," self-defense requires that the principal act with both an actual or honest, and a reasonable, belief in the need to defend against an imminent peril to life or great bodily injury. (*People v. De Leon* (1992) 10 Cal.App.4th 815, 824.)

10

p. 178.)  We reverse only if, after examining the entire record, we conclude it is reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred.  (*Watson*, at p. 836; *People v. Stewart*, *supra*, 77 Cal.App.4th at p. 796.)

C

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  An attempt to commit a crime requires both a specific intent to commit the crime and a direct but ineffectual act done toward its commission.  (§ 21a.)  Therefore, attempted murder requires the specific intent to kill and the commission of a direct act toward accomplishing the intended killing.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.)

Imperfect self-defense is a nonstatutory version of voluntary manslaughter in which the principal actually, but unreasonably, believes in the need to defend against imminent peril to life or great bodily injury.  (*People v. Saille* (1991) 54 Cal.3d 1103, 1107, fn. 1.)  In that scenario, the principal is deemed to have acted without malice.  (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  Therefore, voluntary manslaughter based on imperfect self-defense is an LIO of murder and attempted voluntary manslaughter based on imperfect self-defense is an LIO of attempted murder.  (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1545.)

"[F]or either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's [or principal's] fear must be of

11

imminent danger to life or great bodily injury.' " (*People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082, italics omitted.) In deciding whether a defendant or principal actually believed in the need for self-defense, the jury may consider the effect of prior threats and assaults against him or her, including threats from a third party he or she reasonably associates with the perceived aggressor, along with other surrounding circumstances. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065, 1069; *People v. Bush* (1978) 84 Cal.App.3d 294, 304.)

D

Gonzalez argues the trial court erred by not instructing on attempted voluntary manslaughter as an LIO of attempted murder because there was substantial evidence to support a finding Lopez was the shooter and she acted in the actual or honest, but unreasonable, belief in the need to defend against an imminent peril against her life or great bodily injury. He argues there was substantial evidence to support a reasonable inference Lopez was the shooter. Azabo testified he saw Gonzalez's blue truck return with Lopez and her sister in the front passenger's seat. Also, the surveillance video recordings showed Lopez wore a black tank top and black pants while inside the store earlier and showed that during the subsequent incident the shooter wore a similar black tank top and black pants.

However, we disagree with Gonzalez's assertion that there was sufficient evidence to support a *reasonable* inference Lopez was the shooter. Despite the similarity of Lopez's and the shooter's shirt and pants, there are many distinguishing characteristics that strongly weigh against an inference that Lopez was the shooter shown on the

12

surveillance video recording. When inside the store earlier, Lopez is clearly shown wearing open-toe sandals. Later, during the shooting, the shooter appears to be wearing black shoes and not sandals. More importantly, the surveillance video recordings clearly show that when Lopez initially came to the store with Gonzalez and her sister, Lopez used her right hand to hold her cigarette, reached into her purse with her right hand, and played the video poker game using only her right hand. In contrast, the surveillance video recordings show the shooter extending only his or her *left* hand and arm to aim the gun at Ramirez's SUV. Finally, the video recordings of the shooting show the shooter is thin and demonstrates quickness and agility in getting out of the truck, aiming a gun, firing four or five shots at Ramirez's moving SUV, and getting back into the truck, all within a matter of about 10 seconds or less. In contrast, the video recordings and photographs from Lopez's visit to the store earlier show she could not, in any sense of the term, be considered "thin" and her body type and movements were drastically different from those of the shooter.[7] Furthermore, Carbajal saw the shooter from a distance of about 75 feet away and described him as a "man." Lopez's appearance could not reasonably be confused with a man's appearance. Therefore, considering *all* of the evidence favorably to Gonzalez, we conclude the evidence is insufficient to support a *reasonable* inference that Lopez was the shooter.

---

[7]     The surveillance video recordings also show that unlike the shooter's shorter hair, Lopez had long black hair flowing down to almost the middle of her back.

Assuming arguendo there is substantial evidence to support a reasonable inference Lopez was the shooter, we nevertheless conclude the evidence is insufficient to support a reasonable inference she actually believed she needed to shoot Ramirez in self-defense. Gonzalez argues that Lopez was fearful after she visited the store and the two Paradise Hills gang members threatened to beat her up, and became more fearful after Ramirez, whom she knew was a Paradise Hills gang member, blocked Gonzalez's truck with his SUV. He further argues Lopez may have then later returned to the area with Gonzalez to show she was not intimidated by the Paradise Hills gang, but armed herself with a gun because of her fear of the gang members. He argues Ramirez's SUV could have been hanging around the area to protect Paradise Hills gang territory, could have been following Gonzalez's truck, which could have gone through the store's parking lot three or four times to evade Ramirez. He argues Ramirez may have been driving dangerously close to Gonzalez's truck when Gonzalez stopped it abruptly and Lopez, in fear of an imminent drive-by shooting by Ramirez, got out and fired four or five shots at his SUV. Based on all of those assumptions and inferences, Gonzalez argues Lopez shot Ramirez in the actual belief she needed to defend herself from imminent danger he posed to her life or great bodily injury.

We disagree with Gonzalez's assertion that there is substantial evidence to support a reasonable inference Lopez shot Ramirez in imperfect self-defense. We disagree with Gonzalez's assertion that the evidence supports the scenario he describes in his opening appellant's brief. Although there is substantial evidence to support a reasonable inference Lopez was fearful after the confrontation with the two Paradise Hills gang members

14

inside the store and Ramirez's blocking of Gonzalez's truck on their departure from the store, there is no evidence to support reasonable inferences that: (1) Lopez returned to the area to show she was not intimidated by the Paradise Hills gang and armed herself with a gun because of her fear of the gang members; (2) Ramirez was driving around the area to protect Paradise Hills gang territory and followed Gonzalez's truck; (3) Gonzalez drove his truck through the store's parking lot three or four times to evade Ramirez; and/or (4) Ramirez drove dangerously close to Gonzalez's truck when Gonzalez stopped it abruptly and Lopez, in fear of an imminent drive-by shooting by Ramirez, got out and fired four or five shots at his SUV. Based on the evidence in the record, we conclude Gonzalez's proposed scenario is merely unsupported speculation. There is no evidence to support a reasonable inference Ramirez was following Gonzalez's truck, that Gonzalez was repeatedly driving this truck through the store's parking lot in an effort to evade Ramirez, or that Ramirez's SUV was closely following Gonzalez's truck immediately before Gonzalez abruptly stopped the truck and the shooter got out.[8] Because the evidence is

_____

8      On the contrary, the surveillance video recordings' time stamps show that Ramirez's SUV did not pass by Gonzalez's truck until about seven or eight seconds after Gonzalez turned into the store's parking lot and abruptly stopped his truck. Furthermore, there is no evidence Lopez could have actually believed she was in imminent danger of a drive-by shooting by Ramirez as Gonzalez speculates. There was no evidence Ramirez was following Gonzalez's truck. Ramirez was alone in his SUV with all its windows rolled up and did not display, much less possess, any weapon. Therefore, there is no evidence to support a reasonable inference that Lopez actually believed Ramirez posed any imminent danger to her life or great bodily injury against which she needed to defend herself. Finally, if she actually believed she needed to shoot at Ramirez in self-defense, she would not have continued shooting at his SUV as it continued to drive past her, which shooting resulted in Ramirez getting shot in the back.

15

insufficient to support a finding Lopez was the shooter and actually believed she needed to defend herself from an imminent danger Ramirez posed to her life or great bodily injury, the trial court correctly denied Gonzalez's request for an instruction on attempted voluntary manslaughter as an LIO of attempted murder.

E

Assuming arguendo the trial court erred by not instructing on attempted voluntary manslaughter as an LIO of attempted murder, we nevertheless would conclude that error was harmless and does not require reversal of Gonzalez's convictions. The prosecution presented evidence regarding the confrontation by the two Paradise Hills gang members of Gonzalez and Lopez inside the store and Ramirez's subsequent blocking of Gonzalez's truck on their departure. It also presented extensive testimony by a gang expert who testified on the issues of respect and disrespect in gang culture. The jury could reasonably conclude Gonzalez felt disrespected by the two gang members inside the store and again by Ramirez when his SUV blocked Gonzalez's departure. The jury could reasonably infer Gonzalez decided to retaliate against Ramirez and his rival Paradise Hills gang by returning with another OTNC gang member, who appeared to be a young, thin male, driving through the store's parking lot and its immediate area until Ramirez's SUV happened to drive by, and then stopping to allow the other gang member to get out and fire shots at Ramirez as he drove by in his SUV. Furthermore, had the jury been instructed on imperfect self-defense, based on our discussion of the evidence in section I(D) above, it is highly unlikely the jury would have found Lopez was, in fact, the shooter and that she actually believed she was in imminent danger and needed to shoot Ramirez

16

in self-defense.  Accordingly, it is not reasonably probable Gonzalez would have obtained a more favorable verdict had the trial court instructed on attempted voluntary manslaughter as an LIO of attempted murder.  (*Watson*, *supra*, 46 Cal.2d at p. 836; *Breverman*, *supra*, 19 Cal.4th at p. 178.)

## II

### *Instruction on Self-defense*

Gonzalez contends the trial court erred by not instructing sua sponte on self-defense.  He argues there was substantial evidence to support a reasonable inference that Lopez was the shooter and that she actually and reasonably believed she needed to defend herself against an imminent peril to her life or great bodily injury.  However, as we concluded above, the evidence is insufficient to support a finding Lopez was the shooter and actually believed she needed to defend herself against an imminent peril to her life or great bodily injury.  Therefore, there necessarily is insufficient evidence to support a finding Lopez was the shooter, and actually and reasonably believed she needed to defend herself against an imminent peril to her life or great bodily injury.  Because the evidence is insufficient to support an instruction on self-defense, the court did not err by not instructing sua sponte on self-defense.  (*People v. Wilson* (2005) 36 Cal.4th 309, 331 [court has duty to instruct sua sponte on affirmative defense only if there is substantial evidence to support that defense and it is not inconsistent with defense theory].)

17

III

*Prosecutorial and Instructional Error*

Gonzalez contends the prosecutor prejudicially erred when he misstated applicable law during closing argument. He argues the prosecutor should not have argued that under the court's instructions the gang allegations must be found true even if Lopez was the shooter and she and Gonzalez were members of rival gangs.

A

On the section 186.22, subdivision (b), gang allegations, the trial court instructed the jury with CALCRIM No. 1401 as follows:

> "If you find the defendant guilty of the crimes charged in Counts 1 and/or 2, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant committed that crime for the benefit of or in association with a criminal street gang. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.
>
> "To prove this allegation, the People must prove that: [¶] 1. The defendant committed the crime for the benefit of or in association with a criminal street gang;[¶] AND [¶] 2. The defendant intended to assist, further, or promote criminal conduct by gang members.
>
> "A *criminal street gang* is any ongoing organization, association, or group of three or more persons, whether formal or informal: [¶] 1. That has a common name or common identifying sign or symbol; [¶] 2. That has, as one or more of its primary activities, the commission of Carjacking, Robbery, Murder, Attempted Murder, Assaults with Firearms and Deadly Weapons, Burglaries, felony Vandalism, Possession of Firearms by Felons, and sales of Methamphetamine; [¶] AND [¶] 3. Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity. . . ."

18

In closing argument, the prosecutor argued the evidence proved the truth of the gang allegations because it showed Gonzalez and the shooter shot Ramirez to retaliate for the disrespect shown Gonzalez and the OTNC gang by Ramirez and the Paradise Hills gang members and to then regain respect for the OTNC gang. Gonzalez's counsel argued in closing the evidence did not prove the truth of the gang allegations because it showed Lopez was the shooter, she was associated with the Paradise Hills gang, and Gonzalez was a member of the rival OTNC gang.

In rebuttal, the prosecutor argued the evidence did not show Lopez was the shooter. He further argued, in effect, that the gang allegations would be true even if Lopez was the shooter and she and Gonzalez were from different gangs. He argued:

> "[Defense counsel] . . . said something that I found legally wrong. . . . His statement to you was if it is Clarissa Lopez, then the gang allegation goes away. . . . [T]he law is otherwise. Here's the law.
>
> "The law is that the defendant committed the crime for the benefit of or in association with a criminal street gang. Clarissa Lopez is part of the criminal street gang. She's part of the Paradise Hills [gang]. He's acting with another gang member here. It's still covered by the gang statute. The gang statute is for the benefit of the crime or in association with. In fact, number two is intended to assist, further, or promote criminal conduct by gang members. So if he's doing this with the intent to help Clarissa [Lopez], again, the gang allegation is fully satisfied in a different way than I argued to you. And I still think the first argument is the most reasonable one for you to adopt. But, if you somehow find [defense counsel's] argument to be at least interesting and worth entertaining, you can know it makes no ultimate difference to your opinion, to your decision."

19

He later argued: "As long as [Gonzalez is] doing this with another gang member to help that other gang member commit the crime, like I said, the gang allegation is satisfied." The jury found true the section 186.22, subdivision (b), gang allegations.

B

To the extent Gonzalez contends the prosecutor erred by arguing the gang allegations could be found true even if Lopez was the shooter, he forfeited or waived that error by not timely objecting to that argument below and requesting a curative admonition. (*People v. Hinton* (2006) 37 Cal.4th 839, 863; *People v. Earp* (1999) 20 Cal.4th 826, 858.) Because the record shows Gonzalez did not object to the challenged arguments by the prosecutor, he cannot raise on appeal the issue of prosecutorial error. (*Hinton*, at p. 863; *Earp*, at p. 858.)

C

However, to the extent Gonzalez did not forfeit or waive any prosecutorial error and/or argues the jury instructions were incorrect and arguably affected his substantial rights as a result of the prosecutor's challenged arguments (§ 1259; *People v. Felix* (2008) 160 Cal.App.4th 849, 857 [defendant need not object to preserve claim of instructional error if it affects his or her substantial rights]), we nevertheless conclude those prosecutorial and instructional errors did not prejudice him and do not require reversal of the true findings on the section 186.22, subdivision (b), allegations. Alternatively stated, assuming arguendo the prosecutor misstated the law by arguing the gang allegations could be true even if Lopez was the shooter and she and Gonzalez were associated with different gangs and that error caused the court's instruction on the gang allegations (i.e.,

20

CALCRIM No. 1401) to be ambiguous or incorrect, those errors were harmless under either the state or federal standard for prejudicial error.

First, it is not reasonably likely the jury applied the challenged instruction in the manner the prosecutor argued. (*People v. Rundle* (2008) 43 Cal.4th 76, 149; *People v. Ayala* (2000) 24 Cal.4th 243, 289; *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73 & fn. 4.) In determining that reasonable likelihood, we review the instructions as a whole and the entire record, including arguments of counsel. (*People v. Young* (2005) 34 Cal.4th 1149, 1202; *People v. Smithey* (1999) 20 Cal.4th 936, 988.) In this case, the trial court correctly instructed the jury with CALCRIM No. 1401 on the gang allegations. The court also instructed the jury with CALCRIM No. 200 that it must follow the law as the court explains it and to the extent "the attorneys' comments on the law conflict with my instructions, you must follow my instructions." Therefore, to the extent the prosecutor's rebuttal argument misstated the law as set forth in the court's instructions, we presume the jury followed the court's instructions and disregarded the prosecutor's argument.

Second, even if the jury interpreted the court's instructions (i.e., CALCRIM No. 1401) in the manner the prosecutor argued, our review of the record shows beyond a reasonable doubt the prosecutor's misstatement of the law did not, contrary to Gonzalez's assertion, contribute to the jury's true findings on the gang allegations. As discussed above, considering all of the evidence, the evidence is insufficient to support a reasonable inference that Lopez was the shooter as Gonzalez argued to the jury. Unlike the shooter shown in the surveillance video recordings, Lopez was right-handed, wore sandals, and had a distinctively different body type and long, flowing hair. Also, Segal testified he

21

had never heard of a gang member using a female to do violence or help retaliate against a rival gang, much less having a female present during violent retaliatory acts. Therefore, the evidence shows beyond a reasonable doubt the jury rejected Gonzalez's defense theory that Lopez was the shooter and shot Ramirez because of her past rift with Ramirez's wife. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Chun* (2009) 45 Cal.4th 1172, 1203; *People v. Llamas* (1997) 51 Cal.App.4th 1729, 1740.) Alternatively stated, the assumed errors were not prejudicial because we conclude beyond a reasonable doubt "substantial reasons exist to find that the verdict was based on a legally valid theory" (i.e, that an unidentified OTNC gang member, and not Lopez, was the shooter). (*Llamas*, at p. 1740.) Accordingly, based on our review of the record, we conclude the assumed errors were harmless beyond a reasonable doubt.[9] (*Chapman v. California*, 386 U.S. at p. 24.)

IV

*Ineffective Assistance of Counsel*

Gonzalez contends that if, as we concluded above, he forfeited or waived his claim that the prosecutor misstated applicable law regarding the gang allegations during closing argument, he was denied effective assistance of counsel.

---

[9] To the extent the assumed errors involved only state errors, we conclude, based on the same reasoning discussed above, those errors were harmless because it is not reasonably probable Gonzalez would have obtained a more favorable verdict had those errors not occurred. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

22

A

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*); *People v. Pope* (1979) 23 Cal.3d 412, 422, disapproved on another ground by *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.) To show denial of the right to counsel, a defendant must show: (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217; *Pope*, at p. 425.) To show prejudice, a defendant must show there is a reasonable probability that he or she would have received a more favorable result had his or her counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *Ledesma*, at pp. 217-218.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (*Strickland*, at p. 695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.) It is the defendant's burden on appeal to show that he or she was denied effective assistance of counsel and is entitled to relief. (*Ledesma*, at p. 218.)

"In evaluating a defendant's claim of deficient performance by counsel, there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical

23

decisions. [Citation.] . . . Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Frye* (1998) 18 Cal.4th 894, 979-980.)

However, a court need not address the issue of whether a defendant's counsel performed deficiently before it addresses the issue of whether the defendant was prejudiced by that purported deficient performance. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland*, *supra*, 466 U.S. at p. 697; see also *In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

B

Assuming arguendo Gonzalez's counsel performed deficiently as he asserts, we nevertheless conclude he has not carried his burden on appeal to show that deficient performance prejudiced his case. (*Strickland, supra*, 466 U.S. at pp. 687, 691-692, 697; *People v. Ledesma*, *supra*, 43 Cal.3d at pp. 216-217; *People v. Pope*, *supra*, 23 Cal.3d at p. 425.) Based on our review of the evidence as discussed in section III(C) above, which discussion we incorporate herein, we conclude it is not reasonably probable Gonzalez would have obtained a more favorable verdict had his counsel not performed deficiently as he asserts by not timely objecting to, and requesting curative admonitions for, the prosecutor's challenged statements during closing argument. Alternatively stated, our confidence in the outcome of Gonzalez's trial is not undermined by the purported deficient performance of his counsel. Because he was not prejudiced by his counsel's

24

purported deficient performance, he was not denied his constitutional right to effective assistance of counsel. (*Strickland*, at pp. 687, 691-692, 697; *Ledesma*, at pp. 216-217; *Pope*, at p. 425.)

V

*Cumulative Error*

Gonzalez contends the cumulative prejudicial effect of his asserted errors requires reversal of his convictions and the true findings on the gang allegations. However, based on our review of the record, we conclude beyond a reasonable doubt he received a fundamentally fair trial consistent with his due process rights despite those alleged errors, and any cumulative prejudice from those errors was harmless and does not require reversal of the judgment. (*People v. Woods* (2006) 146 Cal.App.4th 106, 117; *People v. Marshall* (1990) 50 Cal.3d 907, 945; *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349.)

DISPOSITION

The judgment is affirmed.

McDONALD, J.

WE CONCUR:

HALLER, Acting P. J.

AARON, J.

25